RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0034p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KISHNA BROWN,

　　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

BRADLEY LEWIS; NATHANIEL KAMP; JASON
RICHNAK,

　　　　　　　　　*Defendants-Appellants.*

No. 14-1392

---

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:12-cv-14953—Thomas L. Ludington, District Judge.

Argued: October 7, 2014

Decided and Filed: February 26, 2015

Before: KEITH, MOORE, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C.,
Livonia, Michigan, for Appellants. J. Nicholas Bostic, Lansing, Michigan, for Appellee. **ON
BRIEF:** Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia,
Michigan, for Appellants. J. Nicholas Bostic, Lansing, Michigan, for Appellee.

---

## OPINION

---

　　JANE B. STRANCH, Circuit Judge. Based on confusing statements overheard by a
911 operator, several police officers pulled over Kishna Brown, ordered her out of her car at
gunpoint, threw her to the ground, handcuffed her, and detained her in handcuffs for

1

approximately ten minutes. Brown sued three officers who seized her, among other defendants, bringing claims under 42 U.S.C. § 1983 and the Fourth Amendment for unreasonable seizure and excessive force and under Michigan state law for assault and battery. The district court denied qualified and governmental immunity to the defendant officers, concluding that, while the officers had reasonable suspicion to stop Brown, the stop ripened into an unlawful arrest. It further concluded that the officers used excessive force. For the following reasons, we affirm.

## I. FACTS & PROCEDURAL HISTORY

A 911 call from 305 Marsac Street triggered the events leading to this litigation. No participant in the events that gave rise to the stop of Brown as she drove away from that house had a full understanding of what was happening. Because our legal analysis requires an understanding of what each participant knew at different times during the events, the various points of view will be set out separately.

We begin with the recorded 911 call and the events from the perspective of the 911 operator who conveyed some information from the call to the officers in the field. On April 28, 2011, the operator answered a call from 305 Marsac Street and heard a male voice slur: "Yea. Bump and grind goin down.[1] Bump and grind goin down. Uh, you gonna, you gonna send 'em or what?" 911 Audio Recording, R. 24, at 0:22-0:28. (The caller's voice indicates intoxication and is distinct throughout the recording. Although the 911 operator did not know that the voice belonged to Robert Surgeson, we will refer to him by his first name for clarity's sake.) When the operator asked for more information, Robert was unhelpful, telling her, "You figure it out." *Id*. at 0:30-0:31. Apparently, Robert tried to hang up the phone but did not, and the operator heard him saying that the police were about to enter the house. He announced that he was going to hide upstairs and ordered others not to open the door. *Id*. at 2:03-2:10. Laughing, a young female voice joked that she would open the door for the police, as Robert continued to worry: "The po-po's are coming here. The po-po's are coming here. . . . They are. They're on their way. Straight on their way. Don't open the door." *Id*. at 2:20-2:34. As Robert said this, the voices in the background continued to laugh and ridicule him.

---

[1]"Bump and grind" is a slang phrase for a form of sexually suggestive dance. Such an interpretation of Robert's words is consistent with his other statements on the recording, and no party introduces an alternative meaning of the phrase, such as a meaning that would describe criminal activity.

Later, Robert asked for a ride, to which a young male replied that his mother was coming and could drive Robert. At one point, Robert misheard the young voices as telling him that a much-disliked local narcotics officer was outside, which prompted them to laugh at him again. He continued to demand a ride, finally saying "I need a ride. I'm gonna kill that bitch," apparently expressing his frustration that the young man's mother had not yet returned. *Id.* at 13:21-13:24. A couple of minutes later, a new woman arrived (whom we now know to be Robert's sister, Leslie Surgeson) and chastised the caller for getting drunk and using abusive language toward her children. Leslie told Robert that he was drunk and "I don't like you like that." *Id*. at 16:17-16:25. At the time that the 911 operator was overhearing this part of the conversation at the Marsac Street home, the officers in the field had decided to stop Brown.

While the officers were preparing to stop Brown, Robert was overheard asking to borrow money and playing with a young child. Soon after hearing this, the 911 operator decided to stop listening to the call and instead listened to the police-radio chatter. She did not tell anyone that the caller was drunk or that he was still in the house. The seizure of Brown occurred soon after.

Next, there is Brown's experience of events. The afternoon before she was seized, Kishna Brown and her friend Leslie Surgeson left Leslie's house at 305 Marsac Street. Their teenage children remained at the house with Robert. Leslie later received calls from the teenagers, saying Robert had gotten drunk and was acting strangely. The teenagers asked Leslie to return and calm him down. As Leslie and Brown made their way home, another of Brown's daughters called to ask for a ride home from the hospital. Brown decided to drop Leslie off at 305 Marsac Street and go on to the hospital to pick up her daughter.

Brown dropped Leslie off and drove several blocks to Garfield Avenue. After she turned onto Garfield, she noticed that a car had turned south onto the same street, with two police trucks behind it. She saw the car make a U-turn on Garfield, with the police trucks making U-turns soon after, with the trucks then turning on their lights. Thinking that the police trucks were chasing the car, she turned left into a BP gas station to get out of the way.

The police trucks suddenly pulled in behind her. The lights continued to flash, and the officers surrounded her car. She saw an officer open the rear passenger-side door and point an AR-15 rifle at her head. She began to scream "at the top of [her] lungs, what's going on, what

did I do?" The officers shouted at her to "shut the F up" and to put her hands up. She put her hands up, but continued to ask what was going on, which led the officer with the rifle pointed at her head to curse at her. The other officers surrounded the car with guns pointed at her as well.

One of the officers opened the driver-side door and directed Brown to get out of the car. She began to step down from the car, but before her foot touched the ground, two officers grabbed her by her hooded sweatshirt and threw her to the ground about ten feet away. She fell onto her hands and knees, at which point one or two officers put their knees on her back, pushing her to the ground. The police refused to answer her questions about what was going on while they handcuffed her. Once she was in handcuffs, an officer helped her to her feet, and the police began to question her. She told the police that she had just left 305 Marsac Street and that she had dropped Leslie off there. The police demanded that she call Leslie's cell phone, since the landline was off the hook and connected to 911. After an officer spoke to Leslie and learned that Robert did not pose any danger to the police or anyone else, they removed the handcuffs and released Brown. The entire encounter between Brown and the police lasted approximately ten minutes.

The final version of events is the officers' and is evidenced by the recording of the police dispatch radio and dispatch log. Soon after the 911 operator received the call from the Marsac Street house, a police dispatcher described it over police radio. The dispatcher told officers that a "male subject" had "stated there was a bump and grind going on, would not elaborate as to what that was, just said 'send the police.' Has now set the phone down so we have an open line. Can hear him talking to a female, telling her 'go upstairs, don't open the door, the police are on the way.' Still have an open line. Not sure what's going on." Police-Radio Recording, R. 24, at 21:15-21:46. The dispatcher sent a car to the house, and another officer arranged with other units to meet at a nearby city building and coordinate.

While the 911 operator continued to listen to the call, the police dispatcher reported that the caller was "just listening to [the 911 operator]" and breathing into the handset and that a male had asked for a ride and made a comment about "going to kill that … uh … bad female word." *Id.* at 23:56-24:02; 25:11-25:26. The dispatcher described the conversation which included the

"kill that bitch" comment as "not much" of an update.  *Id*. at 25:11-25:13.  He also told the officers about the caller's discussion of the narcotics officer.

At this point, an officer in an unmarked vehicle parked about half a block from the Marsac Street house.  He saw a car (which we now know to have been carrying only Brown) drive away from the house and reported the movement to the dispatcher.  The officers tracked the car, with one of them saying, "She just turned?  I think we're right behind you"  *Id.* at 26:47-26:58.  He erroneously told the officers that she had turned to go southbound, and the officers initially went south.  Soon, they realized she was actually headed north and turned around to stop her.

On the radio, an officer told the others that they would stop the car "right in front of the BP" on the northwest corner of an intersection.  *Id.* at 27:54-27:59.  The officers testified that, when they turned on their lights, they expected the car to pull to the right shoulder of the road, on the southeast corner.  Instead, it pulled into the gas station.

As noted above, the 911 operator failed to tell the dispatcher that the older male suspect was still in the house while the officers prepared to stop the car, nor was that information relayed to the officers.  According to the dispatch log, the police stopped Brown approximately 19 minutes after Robert had placed the call.

The officers' description of the seizure itself differs in several respects from Brown's description, and there is no evidence beyond competing testimony of witnesses and participants. At this stage, we must take Brown's version of facts as true.  There is, however, a dispute that is noteworthy.  The officers insist that, at the beginning of the encounter, they all perceived Brown to be a man.  Under the information available to the officers, if Brown had been a man, she could have been the male on the 911 call talking about hiding from the police.  While the district court did not specifically address this point, there is sufficient record evidence for a reasonable jury to find the opposite.  On the police-radio recording, an officer seems to identify the driver as "she." *Id.* at 26:50.  Furthermore, one officer maintains that he learned she was female only by hearing her voice during questioning, but Brown testified that she was screaming as soon as the officers opened the door to her car.  These discrepancies are sufficient to have created a genuine dispute

of material fact about when the officers became aware that Brown was a woman, and as a result, when they should have realized she could not be the speaker on the 911 call.

Brown sued three of the officers, as well as other defendants, bringing claims that the officers violated her Fourth Amendment rights against unreasonable seizure and excessive force, along with state-law claims for false arrest and assault and battery.[2] The officers moved for summary judgment, arguing that they had not violated Brown's constitutional rights and that they were entitled to qualified immunity on the federal claims and to immunity under Michigan's Governmental Tort Liability Act, Mich. Comp. Laws § 691.1407(2), on the state-law claims. Construing the facts in Brown's favor, the district court concluded that the officers had reasonable suspicion to stop Brown but that the manner and duration of the stop went beyond what the circumstances warranted and therefore constituted an unlawful arrest. The court further concluded that the use of force described by Brown was constitutionally excessive, and that the unlawfulness of the arrest and excessiveness of the force were clearly established at the time of the stop. On the state-law claims, the court concluded that there were genuine disputes of fact about whether the officers' actions were within the scope of their authority, as required for the officers to be immune on the false arrest claim; and, whether the officers' actions were objectively reasonable, as was required for immunity on the assault-and-battery claim. The officers appeal the denials of immunity.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, here Brown. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002). We must view all evidence, and

---

[2]Brown also sued the city of Bay City. The district court granted summary judgment on that claim but did not certify a final judgment under Fed. R. Civ. P. 54(b). Nor did Brown ask us to exercise pendent jurisdiction over the non-final judgment. Also, Brown now characterizes the false-arrest claim as part of her Fourth Amendment wrongful-seizure claim.

draw all reasonable inferences, in the light most favorable to Brown.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

## A.  Federal Claims

### 1.  Jurisdiction

As a preliminary matter, Brown argues that we do not have appellate jurisdiction over some of her claims because the officers fail to accept her version of the facts, despite their conclusory statement to the contrary.  This court has jurisdiction to hear an appeal only from a "final decision" of the lower court.  28 U.S.C. § 1291.  "A district court's denial of qualified immunity is an appealable final decision pursuant to . . . § 1291, but only to the extent that it turns on an issue of law."  *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 495 (6th Cir. 2012) (internal quotation marks omitted).  A defendant may not appeal a district court's denial of qualified immunity in a summary-judgment order "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."  *Johnson v. Jones*, 515 U.S. 304, 320 (1995); *see also Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law.").  An appellate court may overrule a district court's determination that a factual dispute exists only when the record shows that the determination is "blatantly and demonstrably false."  *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011) (quoting *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007)).  We may, however, "exercise jurisdiction over the . . . appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc) (internal quotation marks omitted) (alteration in original).

It is not always clear from the officers' initial brief that they accept Brown's entire version of events.  For example, the officers contend that only one of them participated in handcuffing Brown, so the others could not be liable for any excessive force.  The court does not have jurisdiction to review these contentions because they reflect a dispute of fact.  The officers

do nonetheless raise questions of law concerning the application of the Fourth Amendment to Brown's version of the facts, including the full use of force she describes. This court has jurisdiction over those questions.

### 2. § 1983 and Qualified Immunity

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013). The officers do not dispute that they were acting under color of state law at the time of the incident. They maintain that Brown was not deprived of any constitutional rights and raise the defense of qualified immunity. "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (2006). "Because review of a denial of [a] qualified immunity claim is an issue of law, our review is *de novo*." *Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir. 1991).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court clarified the two-prong test for qualified immunity. *See id.* at 232, 236. To satisfy the first prong at the summary-judgment stage, the plaintiff must show that "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). For the second prong, she must also show that "the violation involved a clearly established constitutional right of which a reasonable person would have known." *Sample*, 409 F.3d at 696; *see also Saucier*, 533 U.S. at 201. The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity. *Pearson*, 555 U.S. at 236.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Id.* at 201. The

court "need not, of course, find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Comstock v. McCrary*, 273 F.3d at 711 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations omitted).  To evaluate the contours of the right, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (internal quotation marks omitted).

Brown's constitutional claims fall into two main categories.  First, she argues that the officers' seizure of her was wrongful because the stop was more intrusive than was warranted by the degree of reasonable suspicion held by the officers.  Second, she argues that the officers' use of force during the stop was excessive.  The district court correctly denied summary judgment on qualified immunity for both claims.

### 3.  Wrongful Seizure

#### i.  Constitutional Violation

The Fourth Amendment provides that, "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend IV.  A seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004).  The Supreme Court has distinguished two forms of seizure, each of which garners a different level of scrutiny.  An officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has "reasonable suspicion," that is, "a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012); *see also Terry v. Ohio*, 392 U.S. 1 (1968) (establishing the permissibility of an investigatory stop based on reasonable suspicion).  For such a stop to be reasonable, "the degree of intrusion into the suspect's personal security [must be] reasonably related in scope to the situation at hand." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006).  If "the length and manner" of the stop, including any force used, are not "reasonably related to the basis for the initial

intrusion," then the stop ripens into an arrest, for which the officers must show probable cause. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999).

We begin by determining the "basis for the initial intrusion." As first articulated by the Supreme Court in *United States v. Hensley*, 469 U.S. 221 (1985), an officer may conduct a stop based on information obtained from fellow officers. This is known as the "collective-knowledge doctrine." When an officer executes a stop based in part on information obtained from another law-enforcement official, the doctrine imputes to the officer conducting the stop the knowledge of those with whom he communicated. "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Id.* at 232 (citations omitted). However, "if the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id*; *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (holding unconstitutional a search executed on the basis of a dispatcher's incorrect statement that a warrant had been issued). Furthermore, "the stop that in fact occurred [must not be] significantly more intrusive than would have been permitted" based on the reasonable suspicion. *Hensley*, 469 U.S. at 232.

For § 1983 individual-capacity cases such as this one, we have recognized a limitation on the collective-knowledge doctrine:

> [I]n a case such as this where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, we consider: (1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information.

*Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007); *see also Hensley*, 469 U.S. at 232 (noting a potential "good-faith defense" to civil suit in collective-knowledge cases). This limitation ensures that an officer is not subjected to liability if he, through no improper action or inaction on his part, conducts a stop that is unconstitutional due to the error of a generally trustworthy source.

Strict application of the collective-knowledge doctrine would result in a determination that the officers did not have reasonable suspicion to stop Brown. The 911 operator did overhear certain statements made by an intoxicated male which could potentially establish reasonable suspicion, namely his statements about hiding from the police and about wanting to "kill that bitch." But no one in the room took the statement seriously; all of the other voices on the call dispute, criticize or laugh at these statements. The statements could therefore support, at most, reasonable suspicion to stop the intoxicated male but no other individual in the house. The 911 operator, moreover, could hear the same intoxicated male voice, still within the house, after the officers saw Brown's car pull away from the house. Because the 911 operator knew that the intoxicated male—the sole individual for whom the police had reasonable suspicion—could not be in the car, the police did not have reasonable suspicion to stop the car.

Because this is an individual-liability suit, however, we must apply the limitation articulated in *Humphrey,* which leads to a different conclusion. Considering the information available to the officers at the time of the stop, there is no evidence that they knew the intoxicated male was still in the house. The 911 operator never communicated that information to the officers. Nor were they told the circumstances and statements heard by the 911 operator that would lead an officer not to take the caller's statements seriously. Excluding this information and examining what each officer could have known, the police could reasonably believe that the male caller drove the car away from the house. The officers had no basis to believe, however, that there had been a woman at the house engaged in criminal activity. Once they could tell that the male caller was not driving the car, the available information no longer supported reasonable suspicion.

Having determined that the officers had a basis to initiate the stop, we turn to the nature of the seizure. Because Brown pulled into the gas station before realizing that the police were trying to stop her, the Fourth Amendment seizure began when the police approached her car, with guns drawn, and opened her car door. The district court described the nature of the seizure after that point, correctly viewed in the light most favorable to Brown, as follows:

> "her car was swarmed by officers armed to the teeth, with numerous guns pointed directly at her head. She was ordered out of her car, and when she moved to comply, she was grabbed by two officers and thrown to the ground. One of the

officers then kneeled on the small of her back, while others still had guns trained on her head and handcuffed her. All the while the Officers responded to her questions and pleas by telling her to 'shut up' and 'be quiet.'"

*Brown v. Lewis*, No. 1:12-cv-14953, 2014 WL 353842 at *12 (E.D. Mich. Jan. 31, 2014). Brown also testified that the officers cursed at her throughout the seizure.

"When the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause." *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008). This occurs "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). "Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion." *Smoak*, 460 F.3d at 781 (internal quotation marks omitted). "'[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Because there is no basis for the officers to argue that they had probable cause to arrest Brown, the stop violated the Fourth Amendment if it ripened into an arrest.

The seizure exceeded the bounds of a permissible *Terry* stop in two respects. First, it was unconstitutional for the officers to continue to detain Brown once they could determine that the male 911 caller was not in her car. At that point, the detention had lasted long enough to dispel their suspicions that they had the person who was evading police and who had stated a desire to "kill that bitch." The actions during the stop as Brown describes them did not give the officers any reason to believe that she was dangerous or involved in criminal activity; she was compliant with officer instructions throughout the stop. Under the version of the events most favorable to Brown, the officers should have been aware of her gender and that she was alone in the car at least as soon as they opened her car door and heard her screaming, but they nonetheless threw her to the ground, handcuffed her, and kept her in handcuffs for about ten minutes.

Even putting the gender issue aside, the nature of the stop, as described in Brown's testimony, was significantly intrusive—to a degree that was not rationally related to the basis of the original intrusion. "[T]he use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, [but] these displays of force must be warranted by the circumstances." *Smoak*, 460 F.3d at 781. Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers.

We have held, for example, that securing a detainee is justified when he admits to having a weapon and is agitated. *O'Malley v. City of Flint*, 652 F.3d 662, 670-71 (6th Cir. 2011) (handcuffing a detainee did not ripen stop into an arrest because the detainee "was angry, raised his voice, turned his back and lifted his shirt, called [officer's] inquiry 'bulls—t,'" and admitted that he had a gun in vehicle); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (detainee said he was armed with stun gun). Sometimes, an unarmed detainee may display aggressive or erratic behavior during the stop that gives rise to a reasonable belief of dangerousness. *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (handcuffing a detainee did not ripen stop into arrest because of detainee's nervous behavior). Similarly, an attempt to flee could justify the use of handcuffs or another form of detention to prevent additional flight during the investigatory stop. *United States v. Jacob*, 377 F.3d 573, 579-80 (6th Cir. 2004) (car containing suspected drug traffickers lurched forward as if to flee after police had cornered it in parking lot).

The details of the suspected crime may also provide the specific facts justifying an inference of dangerousness. In *Humphrey*, the police were responding to a 911 call reporting that an acquaintance had "just tried to pull a gun out and shoot my dad." 482 F.3d at 842. In *Houston*, 174 F.3d 809, the sheriffs' deputies likewise believed that they were searching for a driver who had shot someone, potentially even a police officer. In both cases, officers confronted the detainee at gunpoint and used handcuffs. While in both cases the police turned out to have detained the wrong person (and in *Houston*, no shooting had actually occurred), the nature of the suspicion was closely related to a belief in the ongoing dangerousness of the detainee, and the intrusive methods of conducting the stop did not convert it into an arrest.

Though some crimes may not directly involve violence, they may be so closely associated with violence as to support an inference of dangerousness that justifies intrusive measures during the investigatory stop. *See Atchley*, 474 F.3d at 849 (methamphetamine manufacture); *Radvansky*, 395 F.3d at 309 (burglary); *United States v. Foster*, 376 F.3d 577, 587–88 (6th Cir. 2004) (use of PCP, a drug known to cause violent hallucinations); *United States v. Hurst*, 228 F.3d 751, 758 n.3 (6th Cir. 2000) (burglary).

If there is no specific reason for the officers to believe that the detainee poses a risk of flight or violence, "a bare inference" or speculation that the detainee may somehow be violent is not sufficient to justify the use of handcuffs. In *Smoak*, the defendant troopers had received a 'be on the lookout' notification for the Smoaks' car because it "had been seen traveling at a high rate of speed and had lost a large amount of currency," as well as a second notification that the "vehicle was possibly involved in a robbery." 460 F.3d at 774. As a result, the troopers stopped the Smoaks, ordered them at gunpoint to exit the car and get on their knees, and handcuffed them. *Id*. at 775. The Smoaks were forced to stay in that position even after one of their dogs escaped from the car and a trooper shot the dog. *Id*. at 775–76. Finally, the Smoaks were placed in the back of police cruisers for several minutes. *Id.* We held that the seizure was unreasonably intrusive. *Id.* Similarly, in *Bennett*, the defendant police officers stopped a group of youths on bicycles with a reasonable suspicion that the youths may have been 'casing' a gas-station convenience store. 410 F.3d at 837. However, the officers had no "reasonable belief that the youths were armed and dangerous," particularly since the officers had already conducted (illegal) pat-down searches which revealed no weapons. *Id*. We likewise held that it was unconstitutional to handcuff the youths and place them in the back of a police cruiser in those circumstances.

In the present case, the officers referenced a wide range of speculative inferences from the information conveyed over police radio. The broad range of possibilities they invoked illustrates the lack of concrete information in the police's possession at the time of the stop—and the limited ground for suspicion that a reasonable officer would have. (In their minds, the unidentified male caller could have been engaged in an ambush of police or a hostage situation or a sexual assault or drug activity. *See* Kamp Dep., R. 18-5, at Page ID 156; Richnak Dep., R.

18-7, at Page ID 183–84.)  The only specific piece of information the police had even suggesting that the male caller may have been armed or violent was his overheard comment of "I'm gonna kill that bitch."  This stray comment is too thin a reed to support a belief that the caller posed significant danger such that, with several guns pointed at his head, it would still be unsafe to question him before he was forced to the ground and handcuffed.  When Brown was thrown to the ground and handcuffed, the stop ripened into an arrest without probable cause, and she was seized unlawfully.

### ii.  Clearly Established Law

At the time of the stop, the law clearly established limits on both the duration and nature of an investigatory stop.  As for the duration of the stop, in 2006 we held, "The law is clear that once the purposes of the initial traffic stop are completed, there is no doubt that the officer cannot further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the reasonable suspicion to justify a further detention."  *Smoak*, 460 F.3d at 782 (internal quotation marks and alterations omitted).  The officers therefore are not entitled to qualified immunity for the stop from the point at which they could have determined that Brown was a woman and alone in the car.  The limitations on the intrusive nature of the stop were also clearly established.  In *Smoak*, the court held that a similarly intrusive stop was a constitutional violation, though one that at that point had not yet been clearly established.  *Id.* ("Although the use of guns and handcuffs in the present case was unreasonably intrusive, prior decisions had not made this clear.")  The *Smoak* decision itself clearly established the law for later incidents.

The officers nonetheless argue that *Dorsey v. Barber* shows that the law on when an investigatory stop ripens into an arrest was not clearly established when the officers seized Brown.  In *Dorsey*, an officer received a 'be on the lookout' bulletin describing two car-theft suspects in terms that also described Dorsey and his co-plaintiff, whom the officer saw walking down the street.  517 F.3d at 391–92.  Upon orders to stop and hold the two men, the officer pulled up behind them and ordered them to stop and lie down on the ground.  *Id*. at 392.  When they did not comply and questioned the officer's order, the officer pulled his gun, ordered them to the ground again, and they complied.  *Id.*  The panel concluded that the officer had "made a mistake."  *Id.* at 400.  "Considering that the suspects were wanted in connection with an auto

theft investigation, and that plaintiffs did not manifestly pose an immediate threat to anyone's safety or a risk of flight, [the officer] should have been able to 'stop and hold' them without brandishing his firearm and ordering them to lie face-down on the pavement." *Id*. Although finding that the officer had used "arguably unreasonable" and "unnecessarily intrusive means," this court granted qualified immunity. *Id*. The officers argue that we should apply the same "due deference to the exercise of law enforcement discretion" and find that the actions of these officers were not "so egregious as to suggest outright incompetence" or "knowing[] and deliberate[] violat[ions of] plaintiffs' right to be free from unreasonable seizure." *Id*. at 400–01.

*Dorsey* is inapplicable for two reasons. First, the seizure in *Dorsey* was both less intrusive and more justified than the seizure in the present case. In *Dorsey*, the detainees did not comply with initial commands of a single officer; one officer unholstered a gun; and the detainees were forced to lie on the ground. In the present case, Brown was entirely compliant; there were multiple officers and multiple guns; the guns were pointed at Brown's head; officers threw Brown to the ground and put a knee in her back; and Brown was handcuffed. Second, the officers seem to interpret *Dorsey* as establishing additional deference for law-enforcement decision-making, beyond the constitutional and clearly-established prongs of the qualified-immunity standard. Such an interpretation is incorrect. Our court had, before *Pearson*, 555 U.S. 223, attributed a third prong of "objective unreasonableness" to the qualified immunity analysis. *See Sample*, 409 F.3d at 696 & n.3; *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Mehra*, 186 F.3d at 691. The recent Supreme Court cases of *Pearson* and *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012 (2014), make clear, however, that the test for qualified immunity has only two prongs—whether the defendant violated a constitutional right and whether the right at issue was clearly established; there is no separate "objective unreasonableness" prong. *See Plumhoff*, 134 S. Ct. at 2020; *Pearson*, 555 U.S. at 232, 236. Reasonableness, however, does sometimes play a role in the two prongs. In a Fourth Amendment case, the constitutional test applied in the first prong requires a determination of objective reasonableness. On the second prong, a court must determine whether there was clearly established law at a sufficient level of specificity to put a reasonable officer on notice that the conduct at issue was unconstitutional. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2009). But there is no additional, separate hurdle of reasonableness for Brown to overcome.

In summary, qualified immunity does not protect these officers against an unlawful-seizure claim from the point they became aware that Brown was a woman and no male was in the car. Nor, at this stage, does qualified immunity protect these officers against the unlawful seizure claim based on the nature of the stop because, taking the facts in Brown's favor, the severe intrusiveness of the stop was not justified by any specific facts giving rise to a reasonable fear that Brown was dangerous or a flight risk.

**4. Excessive Force**

Brown's second claim is for excessive force. She contends that the officers used excessive force during the course of handcuffing her by throwing her to the ground and slamming their knees into her back. The district court denied qualified immunity to the officers on this claim. The officers contend that it was not clearly established as unconstitutional to pull a non-resisting subject out of her car and throw her to the ground in the course of handcuffing her in these circumstances. We do not have jurisdiction to review the arguments of two officers that they did not participate in the cuffing, and the corollary questions regarding bystander liability, because these arguments fail to accept Brown's version of the facts.

**i. Constitutional Violation**

In addition to the right to be free from unlawful seizures, the Fourth Amendment also protects individuals from the use of excessive force during an arrest or investigatory stop. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To determine whether the force was excessive, we "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Three factors guide the reasonableness test: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights,* 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). "These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, 735 F.3d at 472.

Under Brown's version of the facts, she was entirely compliant throughout the stop, and she had not fled from the police. When the officers told her to put her hands up, she did so. When they ordered her out of the car, she began to move out of the car. However before she could even reach a foot to the ground, two officers grabbed her by the back of her sweatshirt and threw her down. They then ground a knee into her back while placing the handcuffs.

As the district court noted, "the Officers acknowledge that Brown was fully compliant with every one of their orders; they observed no weapons or hostages in her car, and her hands were in clear view throughout the encounter." *Brown*, 2014 WL 353842 at *14. The officers were not certain that any crime had occurred and had several guns pointed directly at Brown if she did begin to resist. The force used here was not reasonable in light of the totality of the circumstances. This is not the type of situation found in *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008), where similar actions during handcuffing were held not to be unreasonable because the suspect had engaged in a high-speed chase with police and failed to unbuckle his seatbelt when ordered to leave the car. The district court was correct to conclude that, in the circumstances present in this case, it was unreasonable for the officers to have pulled Brown from her car and thrown her to the ground.

### ii. Clearly Established Law

To determine whether a constitutional right is clearly established, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker*, 471 F.3d at 606 (internal quotation marks omitted). The right to be free of excessive force, as a general matter, is clearly established. *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). This circuit has further concluded that, since at least 2009, the use of violence against a subdued and non-resisting individual has been clearly established as excessive, regardless of whether the individual had been placed in handcuffs. *Malory v. Whiting*, 489 F. App'x 78, 85–86 (6th Cir. 2012).

Cases in other circuits provide directly analogous examples, revealing that pulling a compliant detainee out of her car and throwing her to the ground in the process of handcuffing her is clearly established excessive force. In *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341 (1st Cir. 1995), the officer placed a woman under arrest for

refusing to leave a fast-food restaurant, but "without asking or directing Alexis to get up from the table, [the officer] suddenly and violently grabbed and pulled her bodily from the booth and across the table, handcuffed her hands tightly behind her back, and . . . dragged her from the booth, bruising her legs in the process." *Id*. at 346. The First Circuit concluded that, under Alexis's version of the facts, the use of force was constitutionally excessive. *Id.* at 353. In *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), an IRS agent confronted a woman inside her home and, when the woman demanded to see a warrant, "grabbed her by her arms, forcibly threw her to the ground and, twisting her arms, placed handcuffs on her wrists." *Id*. at 1060. The Ninth Circuit similarly concluded that the agent's actions were clearly established as excessive force, because the woman was not resisting. *Id.* at 1061; *see also Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005) (citing *Meredith* as an example in which "tackling has risen to the level of excessive force . . . because . . . the claimants did not pose a tenable threat to the officers' safety").

Denying the existence of clearly established law governing their use of force, the officers cite two unpublished district court opinions in which officers forcefully pulled suspects from a vehicle and a house, respectively, in the course of handcuffing them. *Rehs v. O'Kray*, 2013 WL 501638 (E.D. Mich. Feb. 11, 2013); *Alford v. Pousak*, 2009 WL 1299568 (E.D. Mich. April 29, 2009). These cases are unpersuasive. In *Rehs*, moreover, the court notes merely that the plaintiff did not identify a case "clearly on point," which is not persuasive evidence that no such case exists. 2013 WL 501638 at *7. *Alford* was issued prior to our opinions in *Bletz* and *Malory*. Furthermore, the officers in that case were investigating a specific and dangerous crime, felony home invasion, and detaining a specific suspect who matched the physical description they had received. 2009 WL 1299568 at *2–3. These facts could justify a greater use of force than the circumstances in this case might justify.

Qualified immunity does not protect these officers against Brown's excessive-force claim. Brown's testimony reflects a degree of force against a compliant subject that was clearly established as excessive well before the officers seized her. At trial, the jury will determine whether the officers threw Brown to the ground as she describes, which officers participated in

handcuffing her, and whether any non-participating officers should be held liable for failing to intervene.

**B.  Michigan State-Law Claim**

Brown brings a state-law claim for assault and battery against the officers, and they invoke Michigan's affirmative defense of governmental immunity.  *See* Mich. Comp. Laws § 691.1407.  We have jurisdiction to consider an interlocutory appeal of the denial of governmental immunity on a Michigan state-law claim.  *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007).

Michigan's Governmental Tort Liability Act confers tort immunity on governmental agents.  Subsection (2) of the Act establishes general criteria for governmental immunity in tort, and subsection (3) addresses intentional torts in particular, including assault and battery, providing "Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986."  Mich. Comp. Laws § 691.1407(3).  This language "indicates the Legislature's intent to *confer immunity* on governmental employees for intentional torts to the same extent allowed under the common law as it existed before July 7, 1986."  *Odom v. Wayne County*, 760 N.W.2d 217, 223 (Mich. 2008) (emphasis in original).  The *Odom* court restated the common-law rule as granting immunity only if the government employee or official can show by the preponderance of the evidence that:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Id*. at 228 (citing *Ross v. Consumers Power Co. (On Rehearing)*, 363 N.W.2d 641 (Mich. 1984)).

In other words, Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity.  Michigan governmental immunity "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant

who acts with malicious intent." *Odom*, 760 N.W.2d at 228. That malicious intent is defined as "conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Id.* at 225.

The district court incorrectly applied an objective test to the assault-and-battery claim: "There is, at the very least, a genuine issue of material fact as to whether the Officers' actions were reasonable." *Brown*, 2014 WL 353842 at \*15 (citing *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. 2004)). To the extent that *VanVorous* put forward an objective test for immunity against such claims, it was overruled by *Odom. See Odom*, 760 N.W.2d at 224 n.33 ("Cases holding that governmental employees are protected by more or less than the qualified immunity for intentional-tort liability provided in *Ross* are overruled to the extent that such cases are inconsistent with *Ross*."). This court has recognized that overruling. *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (applying the subjective, *Odom*, test); *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (same); *but see Bennett v. Krakowski*, 671 F.3d 553, 560–61 (6th Cir. 2011) (citing *VanVorous* to apply an objective test); *Jefferson v. Lewis*, 594 F.3d 454, 458 n.2 (6th Cir. 2010) (same).

Taking Brown's version of events as true, the officers threw her onto the ground, despite the fact that she was clearly afraid and cooperating with their orders. A jury could find that this behavior "shows such indifference to whether harm w[ould] result as to be equal to a willingness that harm w[ould] result." *Odom*, 760 N.W.2d at 225; *see also Smith*, 716 F.3d at 934–35 ("If, as the Smiths allege, the officers banged Charles' head against a wall, refused to loosen his cuffs when asked and gratuitously shoved Donnetta, a reasonable jury could find that they acted maliciously."). We therefore affirm the district court's ruling on this issue, albeit on a different ground.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order denying summary judgment on the grounds of qualified immunity and governmental immunity to the officers.