NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0394n.06

Case No. 18-4163

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 01, 2019
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| PAUL FISHER; DARLA FISHER, | ) |
| | ) |
| *Plaintiffs-Appellants*, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE NORTHERN |
| BETSY GORDON; STEPHANIE KOWAL; | ) DISTRICT OF OHIO |
| JULIE BARTH, Ottawa County Department of | ) |
| Job and Family Services in their individual | ) |
| capacities, | ) |
| | ) O P I N I O N |
| *Defendants-Appellees*. | ) |

BEFORE:    COLE, Chief Judge; GRIFFIN and BUSH, Circuit Judges.

COLE, Chief Judge.  Plaintiffs-Appellants Paul and Darla Fisher appeal the district court's

grant of summary judgment in favor of Defendants-Appellees, employees of the Ottawa County

Ohio Department of Job and Family Services Children's Services division (collectively, "OCDJFS

Employees").  The Fishers filed suit under 42 U.S.C. § 1983, alleging that the OCDJFS Employees

violated their procedural-due-process rights for failing to initiate a prompt post-deprivation hearing

following the removal of B.N.F., their adoptive daughter, after she made sexual-abuse allegations

against Paul.  The district court granted the OCDJFS Employees' motion for summary judgment,

finding that they were entitled to qualified immunity because Paul and Darla had consented to

B.N.F.'s removal, and were thus not entitled to a hearing. Because the OCDJFS Employees did not violate any clearly established right, we agree and therefore affirm.

## I.    BACKGROUND

### A.  B.N.F.'s Removal

Plaintiffs-Appellants Paul and Darla Fisher are the adoptive parents of B.N.F., their teenage daughter, and foster parents to two younger children. On April 27, 2015, Defendant-Appellee Julie Barth, a supervisor at OCDJFS, received a report detailing a sexual-abuse complaint B.N.F. had made against Paul. The situation was unique because Paul had a college degree in social work, was licensed by the State of Ohio as a social worker, was familiar with the legalities and processes related to investigation of abuse allegations, and had worked previously for OCDJFS.

The matter was assigned to Defendant-Appellee Betsy Gordon, a caseworker within the division, due to her expertise in sexual-abuse investigations. That same day, Barth and Gordon went to the Fishers' house, accompanied by Ottawa County Deputy Sheriff Matt Gandee, with whom the Fishers had a personal rapport. Only Darla and B.N.F. were home. Gordon spoke with Darla and explained the allegations, while Gandee and Barth spoke with B.N.F. privately in a separate room. Barth noted that B.N.F. stayed consistent in her allegations during their conversation.

At some point, Gordon stepped outside to speak with personnel from child welfare agencies in Lucas and Allen Counties, which had legal custody of the two younger foster children. Both agencies determined that the foster children would be placed in respite care—a temporary home— pending the outcome of the investigation into B.N.F.'s allegations. Once back inside the Fishers' house, Gordon explained to Darla what the county agencies had decided and expressed concerns about B.N.F. remaining in the home with Paul during the investigation. Gordon then explained

that she "was aware off the top of [her] head of two options: that Paul would leave the home while the agency was investigating or that [B.N.F.] would leave[.]" (Gordon Dep., R. 44, PageID 1042.)

In response, Darla stated, "[m]y husband is not going to leave the home." (*Id.*) Gordon asked Darla if she could think of "any other options" to ensure B.N.F.'s safety, to which Darla responded, "No." (*Id.*) Darla then gathered her children's clothing and repeated that B.N.F. would go because Paul would not be leaving. At no time did Darla disagree with the plan or indicate that she thought B.N.F. should stay in the home. Darla also confirmed in her deposition that Gordon informed her that separation was necessary for safety purposes.

While Barth was not present for the conversation between Gordon and Darla, she did say that it was her understanding that Gordon had given Darla the safety spectrum of options, and that Darla had consented to B.N.F.'s removal. Barth also asked Darla if she had any kin, family, or relatives with whom B.N.F. could stay during the pendency of the investigation, to which Darla replied in the negative. Darla does not recall this part of the conversation.

Paul returned home with the two foster children as Darla was gathering the children's belongings. Shortly after Paul arrived, respite care providers came to take B.N.F. Barth testified that once Paul returned home, she explained what course of action was decided upon. Similarly, Gordon stated that she had a conversation with Paul—whom she knew well from his previous employment at OCDJFS—and explained that B.N.F. would "temporarily [be taken] out of the home on the safety plan. And obviously he knew about it, because he was telling [B.N.F.] to be a good girl and listen and not get into trouble." (*Id.* at PageID 1053.) It later became clear though that Paul was already aware of the allegations because he had been in contact with Darla via text message.

Like his wife, Paul admitted that he did not object to B.N.F.'s removal. Paul explained that he did not express disagreement because "[m]y wife had taken [sic] the decision." (P. Fisher Dep., R. 42, PageID 594.) He elaborated: "Darla had made the decision, people were there, the clothes were packed, the kids were being shuffled off. Am I to publicly undermine my wife?" (*Id.* at PageID 594–95.)

### B. Post-Removal

The next day, Gordon informed the Director of OCDJFS, Defendant-Appellee Stephanie Kowal, of B.N.F.'s allegations, the home visit, and that B.N.F. was placed in respite care pending the outcome of the investigation.

On May 1, 2015, four days after B.N.F.'s removal, Kowal visited the Fishers to discuss the financial implications of B.N.F.'s respite care, as the Fishers were responsible for any costs incurred. During their meeting, Paul signed and completed an application for financial assistance, and Darla completed and signed a separate respite care packet of information. At this time, neither Paul nor Darla objected to B.N.F.'s removal or the subsequent out-of-home plan for B.N.F.

On May 5, Barth spoke to Paul by phone and again "explained that because the agency did not have custody and because he and Darla were cooperating with the investigation and understood that [B.N.F.] cannot stay at home during the investigation, that the arrangements were made for the parents to voluntarily respite [B.N.F.][.]" (Gordon Dep., R. 45, PageID 1636.) According to Barth, at no point did Paul object to or challenge the plan. Paul testified that he had no memory of the call one way or the other. Barth's impression, however, was that Paul "seemed to understand everything," and was "absolutely" in agreement with the plan. (Barth Dep., R. 45, PageID 1636.)

On that same day, Gordon testified that she prepared a letter that was sent to the Fishers that "enclose[d] a written copy of the out-of-home safety plan that [was] implemented with their

input and agreement on the 27th of April 2015." (Gordon Dep., R. 44, PageID 1096.) Paul testified that he did not know whether he received the letter.

On May 11—approximately two weeks after B.N.F.'s removal—the Fishers' attorney contacted Gordon and informed her, for the first time, that Paul and Darla did not agree with the out-of-home safety plan. In response, Gordon filed the complaint necessary to trigger a prompt shelter-care hearing in Ottawa County Common Pleas Court Juvenile Division. The next day, May 12, 2015, the juvenile court issued an ex parte order authorizing OCDJFS to take temporary emergency custody of B.N.F. pending further order from the court.

The shelter hearing took place the following day, but the judge ultimately did not issue a ruling because, during the hearing, Paul agreed to leave the home while OCDJFS completed its investigation. Four months later, Paul and Darla filed this suit against the OCDJFS Employees pursuant to 42 U.S.C. § 1983, alleging violations of the Due Process Clause of the Fourteenth Amendment due to their denial of a prompt post-deprivation hearing process.

### C. District Court Decision

The OCDJFS Employees moved for summary judgment, arguing that they did not have to initiate a post-removal hearing because Paul and Darla had consented to B.N.F.'s removal, as well as to the safety plan. The OCDJFS Employees also asserted the defense of qualified immunity. The district court agreed that the OCDJFS Employees were entitled to qualified immunity, finding that the undisputed evidence establishes that Paul and Darla consented to B.N.F.'s removal as part of a safety plan. Paul and Darla timely appealed.

## II.    ANALYSIS

To state a viable claim under 42 U.S.C. § 1983, the Fishers "must demonstrate that (1) they were deprived of a right, privilege, or immunity secured by the Constitution or laws of the United

States and (2) the deprivation was caused by a person acting under color of state law." *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)). The OCDJFS Employees do not dispute that they were acting under the color of state law. They argue, instead, that they did not deprive the Fishers of any constitutional rights and also raise the defense of qualified immunity. We review the district court's grant of summary judgment on the basis of qualified immunity de novo. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). Consequently, qualified immunity shields state officials from monetary damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This means that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Reviewing courts may 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). We begin and end our analysis with the clearly established prong.

### A. Clearly Established Right?

The Fishers argue that they were deprived of their procedural-due-process rights after B.N.F. was removed because they were not given a timely post-deprivation hearing.[1] "Because of a parent's fundamental liberty interest in the custody of his or her child, 'state intervention in the relationship between a parent and child must be accomplished by procedures meeting the requisites of the Due Process Clause.'" *Teets v. Cuyahoga County*, 460 F. App'x 498, 503 (6th Cir. 2012) (quoting *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)). But these procedures, most often in the form of hearings, "are required *only* when a child's removal is instituted or sustained over the parents' objections." *Id.* (emphasis added) (citing *Williams-Ash*, 520 F.3d at 600); *see also id.* ("[A] parent's voluntary consent to a safety plan obviates the need for any additional due process procedures[.]"). Thus, the question here is whether clearly established law would have informed the OCDJFS Employees that they lacked the Fishers' consent to remove B.N.F., such that the lack of a hearing after B.N.F.'s removal resulted in a procedural-due-process violation.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). This means that "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). Ultimately, a "plaintiff bears the burden of showing that a right is clearly established."

---

[1] At various points throughout the brief, the Fishers cite to O.R.C. § 2151.27(A)(1), which states that if a child is taken into custody, "a sworn complaint shall be filed [in juvenile court] with respect to the child before the end of the next day after the day on which the child was taken into custody." The Fishers, however, did not cite the Ohio statute in their complaint, nor did they allege a cause of action under state law. Accordingly, the district court did not address the issue. Similarly, we decline to address the issue for the first time on appeal. *See In re Allied Supermarkets, Inc.*, 951 F.2d 718, 725 (6th Cir. 1991).

*Schattilly v. Daugharty*, 656 F. App'x 123, 128 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013)). In an attempt to meet that burden, the Fishers argue that "a reasonable social service worker under the facts and circumstances of this case would not think that the Fishers were in agreement with a 'voluntary safety plan' of which they had never even been informed." (Appellants Br. 37.)

As an initial matter, the evidence is clear that the Fishers were informed that B.N.F. was being removed for safety purposes: Darla acknowledged during her deposition that Gordon had informed her that B.N.F. needed to be separated from Paul due to safety reasons; Gordon mailed the Fishers a copy of the out-of-home safety plan on May 5, 2015; and the Fishers admit in their briefing that "[o]f course the child [was] being removed for her safety—there is no other legal basis upon which the removal of a child can be demanded." (Reply Br. 9.) And ultimately, the Fishers' attempt to distinguish between a safety plan and a plan of respite care is a distinction without a difference. As the Fishers acknowledge, "the ultimate question concerning consent is not whether the Fishers consented to a safety plan, but whether they consented to the removal of B.N.F. from the home." (Reply Br. 6.)

Turning next to whether the Fishers "were in agreement" with the safety plan, the Fishers failed to cite a case that holds that consent cannot be inferred based on conduct, or that consent must be in writing. The OCDJFS Employees acknowledge that in best practice a safety plan should be in writing and signed by all parties, but argue that consent is not required to be "manifested in a particular way." (Appellees Br. 26.) Because the Fishers provide no case law to refute this, it was not unreasonable, or a violation of clearly established law, for the OCDJFS Employees to believe that they could rely on verbal consent.

We next must determine if the Fishers' statements, behaviors, and lack of objections, were enough for a reasonable official to conclude that the Fishers verbally consented to B.N.F.'s removal. *See Andrews v. Hickman County*, 700 F.3d 845, 856 (6th Cir. 2012) (explaining that the defendant is "entitled to qualified immunity from suit if it would be objectively reasonable for an officer faced with the same circumstances to conclude" his actions were "excused by consent"). We answer that question in the affirmative. After being given several options—Paul leaving the home, B.N.F. staying with a family member, or B.N.F. leaving the home—Darla repeatedly declared that Paul would not be leaving and then began to gather B.N.F.'s clothing. Paul also testified that "Darla had made the decision[,]" indicating that his wife had opted into the arrangement. (P. Fisher Dep., R. 42, PageID 594.)

The Fishers refute the idea that choosing to have Paul stay amounted to consent. Indeed, the Fishers claim that although they may have acquiesced to B.N.F.'s removal, "such acquiescence does not constitute consent[.]" (Appellants Br. 28.) But no clearly established law supports their contention; if anything, our case law contradicts their argument. In *Teets*, we held that even if a parent feels coerced to consent to his or her child's removal, "that fact alone is not enough to establish that [a] safety plan was involuntary." 460 F. App'x at 503. Moreover, in *Williams-Ash*, we adopted the reasoning of the Seventh Circuit to hold that hearings are only "required for deprivations taken over *objection*," regardless of whether the choices presented to parents are "inherently coercive." 520 F.3d at 600 (emphasis added) (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761–62 (7th Cir. 2006)). Thus, it was reasonable in these circumstances for a social worker to interpret Darla's choice to have Paul stay as consent for B.N.F.'s removal.

Ultimately, the statements made by the Fishers, in combination with their admitted lack of objection to B.N.F.'s removal, presented a scenario in which it was reasonable for the OCDJFS

Employees to infer consent. This is especially true in light of Paul's sophistication and familiarity with child removal processes, as well as his rapport with both Gordon and Deputy Gandee, which would have presumably made Paul feel comfortable objecting. Although one can imagine that a less sophisticated plaintiff who is unfamiliar with OCDJFS might acquiesce to his or her child's removal out of fear or confusion, this is not that case, as Paul had extensive expertise in OCDJFS' processes.

At base, there is "no[] doubt that the [Fishers], as any parents likely would, resented the safety plan from the beginning." *Williams-Ash*, 520 F.3d at 601. But as we have held previously, "mere displeasure and frustration fail[] to negate [] consent." *Id.* In the end, "[g]iven the lack of guidance in this area, we are hard pressed to say that a 'reasonable social worker, facing the situation in the instant case, would have known that [her] conduct violated clearly established law.'" *Barber*, 809 F.3d at 847 (quoting *Andrews*, 700 F.3d at 861). Because no case clearly established that relying on the Fishers' actions (and inaction) as evidence of consent was unlawful, the OCDJFS Employees are entitled to qualified immunity. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017).

### B. Violation of a Constitutional Right?

We need not address this prong, for if a plaintiff cannot make both showings under the qualified immunity framework, "the [state officials] [are] entitled to qualified immunity." *Brown*, 779 F.3d at 412 (citing *Pearson*, 555 U.S. at 236).

### III. CONCLUSION

The district court's grant of summary judgment is affirmed.