*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MELODY SMITH; DAVID SMITH; MARI KATLYN
SMITH, By Next Friends and Parents of Melody and
David Smith; MALAKE DANCER, By Next Friends
and Custodians Melody and David Smith; DAVID
SMITH II, By Next Friends and Parents Melody and
David Smith,

　　　　　　　　　　*Plaintiffs-Appellants,*


　　　　*v.*


JUDY WILLIAMS-ASH, Hamilton County Job &
Family Services,

　　　　　　　　　　*Defendant-Appellee.*

No. 06-4638

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00234—S. Arthur Spiegel, District Judge.

Argued:  December 6, 2007

Decided and Filed:  March 26, 2008

Before:  DAUGHTREY, GILMAN, and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:** Stephen R. Felson, NEWMAN & MEEKS CO., LPA, Cincinnati, Ohio, for Appellants.
Michael G. Florez, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for
Appellee.  **ON BRIEF:**  Stephen R. Felson, Lisa T. Meeks, NEWMAN & MEEKS CO., LPA,
Cincinnati, Ohio, for Appellants.  Michael G. Florez, HAMILTON COUNTY PROSECUTOR'S
OFFICE, Cincinnati, Ohio, for Appellee.

　　　　COOK, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. GILMAN,
J. (pp. 6-8), delivered a separate dissenting opinion.

1

---
**OPINION**

---

COOK, Circuit Judge.  David and Melody Smith filed this 42 U.S.C. § 1983 action against Judy Williams-Ash—a social worker employed by the Hamilton County Department of Jobs and Family Services ("Children's Services")—claiming violation of their due process right to a hearing before the temporary removal of their children from their home.  The district court granted summary judgment in favor of Williams-Ash, holding that the Smiths were not entitled to a hearing because they consented to the removal of their children pursuant to a voluntary "safety plan."  We agree and affirm.

I

David and Melody Smith are the parents of two minors and the legal custodians of another minor, Malake Dancer.  The Smiths have custody of Malake—a nine-year-old who suffers from cerebral palsy and other disabilities—through a "kinship program" administered by Children's Services.  Pursuant to this program, Richard Montifore, a Children's Services employee, inspected the Smith home in 2004.  He found a home so "filthy" that he felt uncomfortable leaving Malake and the other children in the house.  Lori Patton—another social worker—viewed the residence and also concluded that the children needed to leave.  Patton found dog feces under one child's bed and so much "clutter" in the house that, in her opinion, the children could not evacuate in the event of a fire.

These unsanitary and dangerous conditions spurred Montifore to call the police (the Smiths were later charged with and convicted of misdemeanor child endangerment).  The next day, Children's Services assigned Williams-Ash to the case.  She persuaded the Smiths to consent to a safety plan that removed the children from the Smiths' home and placed them with friends in the neighborhood.  With the children in nearby homes, the Smiths maintained close contact—they visited, arranged outings, and drove the children to and from school.

The safety plan informed the Smiths, "[Y]our decision to sign this safety plan is voluntary," and read:

1.    This safety plan is a specific agreement to help ensure your child(ren)'s safety.

2.    The custody of your child(ren) does not change under this safety plan.

3.    Children's Services is here to help you protect your child(ren) when you may not be able to do it on your own.

4.    If you cannot or will not be able to continue following the plan, Children's Services may have to take other action(s) to keep your child(ren) safe.

5.    The safety plan will end when you are able to protect your child(ren) without help from Children's Services.

6.    This safety plan may be changed if new or different services are necessary.

7.    You must contact your caseworker immediately if you decide that you cannot or will not be able to continue following the plan.

As a part of ensuring the children's safety, the plan prohibited the Smiths from bringing the children to their home.

Once the parties agreed to the plan and placed the children in safe homes, Williams-Ash launched an investigation into the Smiths' long-term ability to care for the minors. Over the next two weeks, Williams-Ash interviewed the Smiths, the children, the children's doctors, the temporary caregivers, and the Smiths' therapist. She also re-inspected the Smiths' home.

The Smiths allege that during this time they cleaned their house and repeatedly asked Williams-Ash what else they needed to do to allow the children to return. They allege that Williams-Ash ignored their requests for information and threatened to permanently remove their children if they stopped cooperating. Though the record before the district court includes Williams-Ash's response regarding additional requirements necessary to permit the children's return, including doctors' reports about the state of the children's health, we take the Smiths' allegations to be true for purposes of summary judgment.

After two weeks, the Smiths filed this action against Williams-Ash in her individual capacity for violating their substantive and procedural due process rights.[1] Children's Services terminated the safety plan two days later and returned the children—seventeen days after they were removed.

Williams-Ash moved the district court to dismiss, citing her right to qualified immunity. The denial of that motion precipitated the first appeal of this case. It resulted in a dismissal of the Smiths' substantive due process claims, and an affirmance of the denial of qualified immunity, because judging the Complaint only, it set up a violation of the Smiths' clearly established right to procedural due process. *Smith v. Williams-Ash*, 173 F. App'x 363, 366–67 (6th Cir. 2005) (per curiam). Although Williams-Ash argued in her first appeal that the safety plan was voluntary, the panel assumed that Children's Services acted without the Smiths' consent because Williams-Ash failed to enter the plan into the record. *Id.* at 366. The court invited Williams-Ash to reassert her qualified immunity defense "based upon a more complete record." *Id.* at 367 n.1.

## II

This court reviews the grant of a motion for summary judgement de novo, *Westfield Ins. Co. v. Tech Dry Inc.*, 336 F.3d 503, 506 (6th Cir. 2003), and will neither "make credibility determinations [nor] weigh the evidence," *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Instead, we "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Baker v. City of Hamilton*, 471 F.3d 601, 603 (6th Cir. 2006) (quoting *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001)).

## III

To state a viable 42 U.S.C. § 1983 claim, the Smiths must demonstrate that (1) they were deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States and (2) the deprivation was caused by a person acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). Here, no one disputes that Williams-Ash acted under the color of state law, only whether she deprived the Smiths of their right to procedural due process.

"[U]nder the [Fourteenth Amendment], the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law." *Kottmyer v. Mass*, 436 F.3d 684,

---

[1]The Complaint also named Richard Montifore but the Smiths later dismissed the claim against him.

689 (6th Cir. 2006). "Notice and an opportunity to be heard are necessary before parental rights can be terminated." *Ahn v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978).

Williams-Ash acknowledges that Children's Services removed the Smith children from their home without affording the Smiths a hearing. She insists, however, that she did not violate the Smiths' due process rights because she removed the children with the Smiths' consent.

We agree, adopting the reasoning set forth by Judge Posner in *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006). In *Dupuy*, an appeal challenging a preliminary injunction issued in a suit against Illinois's child welfare agency, the Seventh Circuit reviewed the constitutionality of voluntary safety plans similar to the one at issue here. The court held that when a parent voluntarily consents to a safety plan, "no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent." *Id.* at 761–62.

Although the parents in *Dupuy* argued that safety plans are inherently coercive when agencies force parents to sign the plan or face the threat of formal removal proceedings, the court found no fault in this strategy. "It is not a forbidden means of 'coercing' a settlement," Judge Posner stated, "to threaten merely to enforce one's legal rights." *Id.* at 762. He analogized the agency's threat to a plaintiff's legitimate threat to press a case to trial in order to induce a defendant to settle. *Id.* The defendant's choice between accepting a settlement or risking a harsher outcome at trial "is a dilemma implicit in any settlement process. If there weren't a downside to refusing to settle, there would be no settlements." *Id.* at 761.

In this case, the Smiths remained in the safety plan voluntarily at all times. Although our dissenting colleague questions whether the Smiths were coerced into the plan, not even the Smiths argue that they involuntarily consented to *enter* into the plan. Rather, they only argue that they "were not allowed to recover their children *after the Safety Plan had been initiated* despite their best efforts," Appellants' Br. at 17 (emphasis in original), invoking the principle announced in *Farley v. Farley* that the consent given as part of a voluntary safety plan may become involuntary during the course of the plan. 225 F.3d 658, Nos. 98-6114/6115, 2000 U.S. App. LEXIS 17580, at *5 (6th Cir. July 19, 2000) (unpublished). But here, in light of the Smiths' admitted failure to utilize the safety plan's clear, simple mechanism for rescinding the plan, they fail to raise a genuine issue of material fact with respect to their continuing consent to the plan.

In addition to informing the Smiths that their agreement with Children's Services relied on their voluntary participation ("[Y]our decision to sign this safety plan is voluntary"), the safety plan instructed the Smiths to inform Williams-Ash if they no longer wanted to participate ("You must contact your caseworker immediately if you decide that you cannot or will not be able to continue following the plan."). As the district court correctly concluded, the Smiths never alleged that they attempted to contact Williams-Ash—or anyone else at Children's Services—to revoke their consent. Rather than take this intuitive step, the Smiths retained counsel and sued for damages. Unsurprisingly, after Children's Services first received notice (through the lawsuit) that the Smiths renounced the safety plan, it promptly terminated the plan and returned the children to the Smiths' home.

The Smiths concede their failure to revoke pursuant to the plan's instruction to alert Williams-Ash. As they see it though, their repeated inquiries to Williams-Ash about both her investigation's length and what they needed to do to speed the children's return "amounted to the same thing" as an explicit demand to terminate the safety plan. Appellants' Br. at 15.

The plain-language form provided to the Smiths undercuts their argument. It told them to revoke their consent by advising their caseworker. To have opted out of the plan would have triggered consequences: Children's Services would either return the Smiths' children or seek to keep

the children with their temporary caregivers by filing a civil complaint against the Smiths. *See* Ohio Rev. Code § 2151.353(A)(2) (authorizing Ohio's juvenile courts to award temporary custody of neglected children to a public services agency). Questioning about the timing of a procedure opted for to avoid the potential of a more onerous one—a formal custody proceeding—cannot tenably be viewed as equivalent to opting out. We do not doubt that the Smiths, as any parents likely would, resented the safety plan from the beginning. But mere displeasure and frustration fails to negate their consent. Rather than remind Williams-Ash of what she already knew—that they disliked the plan—the Smiths needed to explicitly withdraw the consent they explicitly gave, thus requiring Children's Services to either return the children or file a formal complaint against them. In light of their admitted failure to do so, the Smiths were not entitled to a hearing.[2]

IV

For these reasons, we affirm.

---

[2]Given this conclusion, we do not reach Williams-Ash's arguments that absolute and qualified immunity shield her from liability.

_____

**DISSENT**

_____

RONALD LEE GILMAN, Circuit Judge, dissenting. Because I believe that there is a genuine issue of material fact as to whether the Smiths' consent to the safety plan was voluntary, I respectfully dissent.

## I.   CONSENT

There is no question that "the parent-child relationship gives rise to a fundamental liberty interest that a parent may not be deprived of absent due process of law," *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006), and that "notice and an opportunity to be heard are necessary before parental rights can be terminated." *Anh v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978). Although Williams-Ash acknowledges that Children's Services removed the three children in question without a hearing, she insists that she did not violate the Smiths' due process rights because they voluntarily consented to the removal of their children when they signed the safety plan. The Smiths, on the other hand, argue that they have presented sufficient evidence to raise a genuine issue of material fact as to whether they voluntary consented to enter into the plan and whether their consent became involuntary during the course of the plan.

The majority contends that *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006), a case involving the constitutionality of voluntary safety plans, is decisive here. I respectfully disagree. The parents in *Dupuy* argued that the state agency had coerced their consent by threatening to formally remove their children from them. No fault was found in this threat, however, because the agency had the valid legal authority to remove the children. *Id.* at 762-63. Noting that "[i]t is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights," the court held that when a parent voluntarily enters into a safety plan, "no hearing of any kind is necessary [because] hearings are required for deprivations taken over objection, not for steps authorized by consent." *Id.* at 761-62.

The *Dupuy* decision, however, is distinguishable from the present case. *Dupuy* rests on the premise that the threat of action made by the state agency was grounded in proper legal authority and, therefore, the consent given by the parents was not coerced. *Id.* at 762-63. The court in *Dupuy* specifically found that the agency threatened to enforce only its valid legal right to initiate a formal custody proceeding against the parents. *Id.* at 761-62. *Dupuy* acknowledged, however, that consent garnered through misrepresentations or other wrongful means would be involuntary if it was "not grounded in proper legal authority" or granted as the result of "duress or extortion." *Id.* at 762-63.

In the present case, Melody Smith's affidavit provided sworn testimony that Williams-Ash made a number of threats that Williams-Ash had no legal right to make. Melody Smith specifically stated that Williams-Ash told the Smiths that (1) if they did not participate in the safety plan, they would be put in jail, (2) if they did not follow her instructions, "the children [would not] come home, period," (3) if the kids stepped foot in the Smiths' house, the Smiths would be put in jail and they would never get the kids back, and (4) if the Smiths attempted to withdraw from the safety plan, such withdrawal would result not only in formal custody proceedings against them, but they would be sent to jail.

Because imprisonment is not a permissible consequence of the failure to participate in a voluntary safety plan, Williams-Ash had no legal basis to make such threats. If the Smiths' allegations are true, then Williams-Ash's threats go beyond simply warning the Smiths that Children's Services would move forward to enforce a valid legal right. A jury could therefore

conclude that the Smiths' participation in the safety plan was the result of forbidden "duress or extortion." *Dupuy*, 465 F.3d at 762; *see also Croft v. Westmoreland County Children & Health Servs.*, 103 F.3d 1123, 1125 n.1 (3d Cir. 1997) (finding the caseworker's conduct "blatantly coercive" in securing a parent's voluntary departure from the house by improperly threatening to place his four-year-old daughter in foster care).

Alternatively, the Smiths argue that, even if they are found to have originally agreed to the safety plan voluntarily, their consent became involuntary during the course of the plan. They assert that they "were not allowed to recover their children after the Safety Plan had been initiated despite their best efforts to do so," and that William-Ash "thwarted" their attempts to regain custody of their children. Specifically, the Smiths allege that Williams-Ash told them that if they did not obey the plan, she "would see to it that the children didn't come home, period," that she responded to their requests for the return of their children by telling them that they should just "enjoy their time alone without the kids," and that she told them that any attempt to withdraw from the voluntary plan would result in formal custody proceeding, jail, and loss of custody of the children.

This court in *Farley v. Farley*, 225 F.3d 658, Nos. 98-6114/6 115, 2000 U.S. App. LEXIS 17580 (6th Cir. July 19, 2000) (unpublished), found that consent given as part of a voluntary safety plan may become involuntary during the course of the plan. The mother in *Farley* voluntarily agreed to a safety plan that allowed her two children to stay with their father, but that left her with legal custody of the children during the course of the plan. *Id.* at *4. When the mother eventually sought the return of her children, the agency told her that it had 60 days to conduct the investigation and refused to return them. *Id.* at *5. Only after the mother sought the assistance of the district attorney were the children returned to her. *Id.* In considering whether the social worker was entitled to qualified immunity, the *Farley* court held that the mother's due process rights were clearly violated because her consent "was not voluntary during the entire time period involved." *Id.* at *14.

Like the mother in *Farle*y, the Smiths claim that their consent became involuntary during the course of the plan. The district court declined to give their argument credence because, despite the Smiths' many attempts to secure the return of their children, they did not explicitly state that they could not or would not continue following the plan. The terms for withdraw stated in the safety plan, however, were somewhat vague. The plan stated only: "You must contact your caseworker immediately if you decide that you cannot or will not be able to continue following the plan."

The Smiths allege that they repeatedly contacted Williams-Ash as required by the terms of the safety plan, that they made repeated attempts to get specifics from Williams-Ash as to what they needed to do to recover their children, and assert that Williams-Ash threatened them with jail and permanent loss of custody if they withdrew from the plan. Their decision to hire an attorney to secure the return of their children also strongly suggests that their consent to the plan had become involuntary, and the fact that the children were returned to the Smiths two days after they filed a lawsuit, without any further investigation on the part of Children's Services, suggests that the agency may not have had good reason for continuing to detain the children. I therefore conclude that the Smiths have raised a genuine issue of material fact as to whether they continued to consent to the safety plan, and that the district court erred in granting summary judgment to Williams-Ash on that ground.

## II.  IMMUNITY

Neither the majority opinion nor the district court reached the issue of whether Williams-Ash is entitled to absolute or qualified immunity. Because I believe that the Smiths' procedural due process claim should survive summary judgment, I must address the question of

immunity. I conclude that Williams-Ash is not entitled to absolute immunity, but I would remand to the district court the question of whether she is entitled to qualified immunity.

This circuit has strictly tied absolute immunity to either in-court conduct or conduct that was otherwise "intimately associated" with the judicial process. *Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000). Social workers are therefore "absolutely immune only when they are acting in their capacity as legal advocates—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions." *Id.* 220 F.3d at 775. Because all of Williams-Ash's alleged conduct here occurred out of court, she functioned as a service provider and an investigator—not as an in-court advocate—and is therefore not entitled to absolute immunity.

As for qualified immunity, the Supreme Court requires the use of a two-step inquiry to decide whether a defendant is entitled to such immunity. *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007); *Hudson v. Hudson*, 475 F.3d 741, 745 (6th Cir. 2007). The court must first consider whether the defendant's conduct violated a constitutional right of the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a constitutional violation occurred, the court must then consider whether the violated right was clearly established at the time the violation occurred. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Because, as discussed above, the question of whether William-Ash's conduct violated the Smiths' constitutional rights hinges on the factual question of whether the Smiths voluntarily consented to the safety plan, this issue should be initially resolved by the district court.

## III.   CONCLUSION

I believe that a genuine issue of material fact exists as to whether the Smiths' initial and continuing consent to the safety plan was voluntary. I would therefore reverse the judgment of the district court and remand the case for further proceedings.