RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0023p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────────

MARK BAMBACH, individually and on behalf of his
minor children; E.B. and M.B., in their own right,

> *Plaintiffs-Appellees*,

*v.*

No. 23-1372

GINA MOEGLE, individually, in her capacity as
Children's Protective Services Investigator, Michigan
Department of Health and Human Services; SUSAN
SHAW, individually, in her capacity as Children's
Protective Services Supervisor, Michigan Department
of Health and Human Services,

> *Defendants-Appellants*.

─────────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cv-14039—Denise Page  Hood, District Judge.

Argued:  January 24, 2024

Decided and Filed:  February 8, 2024

Before:  McKEAGUE, LARSEN, and MURPHY, Circuit Judges.

─────────────────────

### COUNSEL

**ARGUED:**  Neil A. Giovanatti, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellants.  Brian M. Garner, TAYLOR BUTTERFIELD, P.C., Lapeer,
Michigan, for Appellees.  **ON BRIEF:**  Neil A. Giovanatti, Patrick L. O'Brien, OFFICE OF THE
MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Brian M. Garner,
TAYLOR BUTTERFIELD, P.C., Lapeer, Michigan, for Appellees.

---

**OPINION**

---

McKEAGUE, Circuit Judge.    Gina Moegle and her supervisor Susan Shaw, both employees of the Children's Protective Services program in the Michigan Department of Health and Human Services, appeal the district court's partial denial of qualified immunity for eleven claims filed against various State of Michigan defendants by Mark Bambach and his minor children under 42 U.S.C. § 1983.

We find that no clearly established law put the state defendants on notice that they were violating the Bambachs' Fourteenth and Fourth Amendment rights.    Accordingly, we **REVERSE** the district court's denial of summary judgment and **REMAND** for entry of an order dismissing the Bambachs' claims against the state defendants.

### I.    BACKGROUND

Mark Bambach[1] and his two children first sued Gina Moegle and Susan Shaw ("state defendants"), as well as an additional state social worker and the municipal government of Lapeer County, Michigan, on December 23, 2018.    Relevant to this appeal, the Bambachs alleged five counts under 42 U.S.C. § 1983 against Moegle: that she (1) removed the Bambach children from Bambach's custody without a warrant in violation of the Fourth Amendment, (2) removed the Bambach children from Bambach's custody in violation of the Fourteenth Amendment's procedural-due-process protections, (3) removed the children in violation of the Fourteenth Amendment's substantive-due-process protections, (4) executed a removal order that Moegle knew contained falsehoods and material omissions in violation of the Fourth Amendment, and (5) violated the Fifth Amendment by failing to return Bambach's children after he invoked his right against self-incrimination.

---

[1]Generally referred to as "Bambach." "The Bambachs" and "the plaintiffs" refer collectively to Bambach and his two children, on whose behalf Bambach also sues.

The Bambachs further alleged four counts against Shaw: that as Moegle's supervisor she implicitly authorized (1) removal of Bambach's children without a warrant, (2) violation of the Bambachs' Fourteenth Amendment procedural-due-process and (3) substantive-due-process rights, and (4) execution of a false and misleading removal order in violation of the Fourth Amendment.

Finally, the Bambachs alleged that a state social worker failed to intervene in the continued removal of the Bambach children and that Lapeer County—specifically, the county prosecutor's office—maintained policies that led to the above constitutional violations. The district court dismissed the claim against the state social worker on absolute immunity grounds. Later, the court granted summary judgment to Lapeer County, finding that because the allegations involved a county prosecuting attorney acting as a contractor for the Michigan Department of Health and Human Services—and not acting on the county's behalf—the Bambachs had presented no evidence that Lapeer County itself had established or maintained unconstitutional policies or customs. Further, the court granted judgment to Moegle on the Fifth Amendment claim, finding she had not conditioned returning Bambach's children on any admission of guilt. In this interlocutory appeal, the Bambachs cannot challenge dismissal of the claims against the state social worker and Lapeer County. They similarly cannot challenge dismissal of the Fifth Amendment claim against Moegle.

Before us is the district court's denial of the state defendants' motion for summary judgment on the Fourth and Fourteenth Amendment claims. We construe disputed facts in the Bambachs' favor and defer to the district court's factual determinations. *See Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020); *Fazica v. Jordan*, 926 F.3d 283, 288 (6th Cir. 2019).

A.    **Factual History**

Mark and Amy[2] Bambach are parents to twin daughters, M.B. and E.B. Mark and Amy divorced in September 2013. Bambach received primary custody of the two children in November 2012. Amy did not interact much with her daughters from November 2012 to April 2015. But in

---

[2]Referred to as "Amy" or "Amy Bambach" throughout.

May 2015, Amy began exercising her parental rights more frequently. From July to December of that year, she saw her daughters for overnight visits more than a dozen times.

Amy scheduled parenting time with M.B. and E.B. from December 23 to the morning of December 25, 2015. She picked up her daughters as scheduled on the twenty-third. According to a police statement Amy later submitted, M.B. told her mother on the evening of December 24 that Bambach, while cleaning M.B., hurt her "really bad" by sticking his finger "way up there." Amy Bambach Police Statement, R.84-3 at PageID 2438. Amy immediately took both daughters to the emergency room for examination.

At the hospital, Amy disclosed her concerns of sexual abuse to physicians. Upon examination, emergency-room physicians diagnosed both M.B. and E.B. with acute urinary tract infections. Physicians further noted potential diagnoses of alleged sexual assault. Early the next morning, on December 25, Children's Protective Services received a third-party report of actual or suspected child abuse recounting Amy's concerns about Bambach's alleged sexual abuse of the couple's daughters. Upon receiving the report, Protective Services assigned Moegle to investigate. Shaw supervised the investigation.

Moegle began her inquiry. Among other tasks, she called Bambach on December 25 to notify him of allegations that he had sexually abused his daughters. During that call, Moegle asked Bambach if his daughters could stay with Amy during the pendency of the investigation. He agreed. Bambach admits that at no point during the call did he ever indicate that he did not consent to having his daughters stay temporarily with Amy while the investigation was performed. Indeed, Bambach acknowledges that he—at least initially—expressly consented to this temporary plan to have his daughters stay with Amy. Relatedly, Moegle and Protective Services never sought or received a court order authorizing the children's removal until a county court heard Moegle's petition on January 14, 2016. As a result, Bambach's children stayed with Amy from December 25—the day Moegle first called Bambach—to January 14—the day a county court heard the removal petition—subject only to Bambach's initial consent to the temporary placement plan.

Four days after Moegle's first call, Bambach called her back to ask "when he was getting his kids back." Second Am. Compl., R.9 at PageID 174. He claims he "made it clear" to Moegle

that he wanted to see his daughters again and that he wanted them back. Appellee's Br. 15; *see also* Bambach Dep., R.82-13 at PageID 2144. Moegle told Bambach that, pursuant to her agency's policies, she could not answer his questions during an ongoing investigation. The next day, December 30, Bambach again called Moegle. He wanted to know "what happens next" and whether "the girls have been interviewed." Investigative Report, R.82-2 at PageID 1661; *see also* Second Am. Compl., R.9 at PageID 194–95. Moegle told him that law enforcement would contact him soon for a statement. Bambach responded that he would not speak to any law enforcement officers without an attorney present. Later that day, Moegle and Bambach spoke again; she encouraged him to set up a meeting with an attorney present as soon as possible, and he reiterated that he would not speak with law enforcement and wanted to take "the 5th." Second Am. Compl., R.9 at PageID 195; *see also* Investigative Report, R.82-2 at PageID 1661. Although Bambach agreed at the time to meet later with Moegle to discuss the investigation, he subsequently changed his mind. From that point—January 5, 2016—to January 14, which is when Moegle filed a petition for removal of Bambach's children in family court, Moegle and Bambach did not speak.

Shaw's supervision of Moegle's investigation began soon after the investigation commenced. Moegle met with Shaw on December 30 to provide her with information about the case. Moegle again met with Shaw on January 12, providing her with further updates about the investigation. Moegle claims that Shaw then read and approved the removal petition that Moegle prepared before she sent it to the county prosecuting attorney. After Moegle submitted the removal petition, she completed an investigative report on January 15 in which she concluded that a preponderance of evidence suggested Bambach had sexually abused his daughters. Shaw reviewed and approved the report on January 22.

## B.     Procedural History

A Lapeer County court heard preliminary arguments on Moegle's removal petition on January 14, 2016. The court temporarily approved the petition, finding probable cause supported the allegations that Bambach had abused his daughters. The court further found it would be contrary to the children's welfare to remain in Bambach's home given the abuse allegations. The case continued for months. Each set of parties deposed multiple individuals. On November 1,

2016—one day before trial was set to begin—the county prosecuting attorney agreed to dismiss the petition. The court immediately released Bambach's children to him.

Bambach filed this lawsuit on December 23, 2018. He alleged under § 1983 that Moegle, Shaw, a state social worker, and Lapeer County violated his and his daughters' Fourth, Fifth, and Fourteenth Amendment rights. Moegle, Shaw, and the social worker moved to dismiss, raising qualified and absolute immunity defenses. The district court granted the motion in part, dismissing all claims against the social worker and finding that Moegle and Shaw possessed absolute immunity as the state's legal advocates for all acts taken in initiating court proceedings, filing a removal petition, and furthering court proceedings thereafter. The court, however, denied the state defendants' qualified immunity defense against Bambach's claims for the time period prior to preparing and filing the removal petition. After more than a year of discovery, Moegle and Shaw moved for summary judgment on July 1, 2021. Both state employees raised a qualified immunity defense. Lapeer County filed a separate motion and Bambach filed a cross-motion for summary judgment against Moegle and Shaw.

In an order partially granting the defendants' motions, the district court disposed of all claims against Lapeer County, finding that the plaintiffs had presented no evidence that the county had violated the Bambachs' rights. The court further granted Moegle judgment on Bambach's Fifth Amendment claim. The court denied Moegle and Shaw summary judgment, though, on the Bambachs' Fourth and Fourteenth Amendment claims. The district court found that the key factual dispute underpinning the remaining claims was whether Bambach's children were removed from his custody without his consent from December 29, 2015, to January 14, 2016, which is when a county court authorized the temporary removal. The court found a reasonable jury could determine that Bambach had revoked his consent to his children's placement with Amy by expressing to Moegle on December 29 and 30 that he wanted to see his children and wanted to know when they would be back. If true, the court found, that lack of parental consent to the children's continued removal would violate the Bambachs' constitutional rights.

The court's analysis of the state defendants' qualified-immunity defense, however, failed to assess whether those constitutional rights were clearly established at the time of the violations. The court solely rested its summary-judgment order on its finding that a reasonable jury could

determine that Moegle and Shaw had violated the Bambachs' rights. So, the unresolved question before us, assuming Bambach did revoke consent, is whether clearly established law put Moegle and Shaw on notice that they were violating the Bambachs' constitutional rights by failing to release the children to their father.

Moegle and Shaw timely appealed the district court's order.

## II.　　JURISDICTION

The parties dispute whether we have jurisdiction to hear this interlocutory appeal. The state defendants argue that the district court's denial of summary judgment is considered a final order under 28 U.S.C. § 1291 and the collateral-order doctrine as applied in *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The Bambachs contend that this appeal is not limited to purely legal issues, meaning that we lack jurisdiction.

We possess jurisdiction over the district court's denial of qualified immunity to Moegle and Shaw because, where we assume the plaintiff's version of any disputed facts, the district court's denial of qualified immunity constitutes an appealable collateral order. *See Coffey v. Carroll*, 933 F.3d 577, 583 (6th Cir. 2019); *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006); *Mitchell*, 472 U.S. at 530. We have jurisdiction over interlocutory appeals of denials of qualified immunity that turn on legal questions. *See Bomar v. City of Pontiac*, 643 F.3d 458, 461 (6th Cir. 2011); *Coffey*, 933 F.3d at 583; *Mitchell*, 472 U.S. at 527. However, we do not have jurisdiction over appeals to the extent that they concern genuine disputes about factual questions. *See Coffey*, 933 F.3d at 583; *Bomar*, 643 F.3d at 461.

In this case, though, the state defendants do not challenge the district court's factual determinations, and we may construe any disputed facts in the Bambachs' favor in order to preserve our jurisdiction. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609–11 (6th Cir. 2015); *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002); *see also Coffey*, 933 F.3d at 583–84. The state defendants do not challenge the district court's determination that genuine disputes of material fact suggest Moegle and Shaw may have committed constitutional violations. So, we assume they did. Instead, the state defendants argue only that no clearly established law put Moegle and Shaw on notice that they may have committed constitutional violations. We may

resolve that question—a purely legal question—on interlocutory appeal. *See DiLuzio*, 796 F.3d at 609.

## III.     ANALYSIS

### A.     Standard of Review

Where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law, a court must grant summary judgment. *See* Fed. R. Civ. P. 56(a). On appeal, we review de novo a district court's rejection of qualified immunity at the summary-judgment stage. *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020). Other than in scenarios where a plaintiff's fact characterizations blatantly contradict the record, we must construe all facts in the light most favorable to the plaintiff's version of events. *See Coffey*, 933 F.3d at 584. We ask whether a reasonable juror could find that (1) "the defendant violated a constitutional right," and (2) "the right was clearly established." *Schulkers*, 955 F.3d at 532 (quoting *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013)). Ordinarily, we may consider either prong of the inquiry first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, though, the state defendants have not challenged the Bambachs' assertion that a constitutional violation occurred. *See* Appellants' Br. 17–18 ("Moegle and Shaw do not contest the district court's holding as to the first element . . . ."). So, we assume Moegle and Shaw did violate the Bambachs' rights, and we assess only the second question: were those rights clearly established? In this case, that determination turns on whether the law clearly establishes that failure to return children after an implied revocation of consent to a temporary placement plan violates the plaintiffs' Fourth and Fourteenth Amendment rights.

Qualified immunity serves to limit government officials' "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell*, 472 U.S. at 517. The immunity serves dual values: ensuring that wronged individuals can vindicate their constitutional rights while simultaneously reducing the social costs that result from subjecting public officials to increased litigation, like the distractions officials may

face in contending with numerous lawsuits and the deterrent effect such litigation might have on otherwise capable people who choose not to enter public office. *Harlow*, 457 U.S. at 813–14.

State officers are shielded from civil liability for their actions unless they have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. The rights must be sufficiently clear—and defined at a sufficiently precise level—to ensure that "every reasonable official would have understood that what he is doing violates" those rights. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). Existing law at the time of the alleged violation must have "placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The legal landscape at the time of the violation must give state defendants "fair warning" that their actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To be sure, officials may still be "on notice" that their conduct is unconstitutional "even in novel factual circumstances," *id.*, but the contours of the alleged rights violation must not be defined at too high a "level of generality." *Al-Kidd*, 563 U.S. at 742. It must be "apparent" from existing law that the state defendants' actions violated a "particularized" constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The immunity applies when an officer "reasonably misapprehends the law governing the circumstances she confronted," even if that misapprehension was "constitutionally deficient." *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

The plaintiff bears the burden of showing the law was clearly established at the time of the alleged violation. *Andrews v. Hickman County*, 700 F.3d 845, 853 (6th Cir. 2012). And although we construe disputed facts in the nonmoving party's favor, we limit our consideration to those facts "knowable to the defendant officers." *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam).

**B.      Moegle Is Entitled to Qualified Immunity on the Bambachs' Fourth and Fourteenth Amendment Claims.**

The Bambachs cannot point to any law clearly establishing that Moegle violated the Bambachs' constitutional rights by failing to return the Bambach children to their father in the period from December 29, 2015, to January 14, 2016.  Relevant caselaw outlines two bookends to a spectrum.  At one end, where state employees remove children from their parents' care without a valid court order and without either parental consent or pre-removal process, the state workers violate either the Fourth or Fourteenth Amendment—or both.  *See Kovacic*, 724 F.3d at 695–700 (violation of Fourth Amendment); *Doe v. Staples*, 706 F.2d 985, 988–90 (6th Cir. 1983) (violation of Fourteenth Amendment procedural due process); *Vinson v. Campbell Cnty. Fiscal Ct.*, 820 F.2d 194, 200–01 (6th Cir. 1987) (violation of Fourteenth Amendment substantive due process).  At the other end, though, where state workers receive parental consent to temporarily remove children from custody, the state employees do *not* violate any constitutional rights, even if they do not obtain a court order or follow any other process for the removal.  *See Smith v. Williams-Ash*, 520 F.3d 596, 599–600 (6th Cir. 2008); *see also Teets v. Cuyahoga County*, 460 F. App'x 498, 503 (6th Cir. 2012).  The Bambachs' claims sit somewhere in the middle.  Here, Moegle and Shaw did not obtain a court order until January 14, 2016.  On December 25, 2015, Bambach explicitly consented to his children's removal.  Then, after several days, we assume he impliedly revoked his consent to that temporary placement—but that he failed to *explicitly* revoke his consent.

We must determine whether the law clearly established in December 2015 that the failure to return the Bambach children to Bambach following his implied revocation of consent violated the Bambachs' constitutional rights.  The answer is no.  Not only is there no existing caselaw that clearly supports the Bambachs' argument, but the closest factual analogue the Bambachs can identify—*Smith v. Williams-Ash*—cuts in the state defendants' favor.

**1.      No Existing Law Clearly Established that Moegle Violated the Bambachs' Rights to Substantive or Procedural Due Process.**

The Constitution clearly protects both a "procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000); *see also Schulkers*, 955 F.3d at 539–43 (postdating the events in this case but

outlining clearly established Fourteenth Amendment precedent, all of which existed prior to December 29, 2015).  The Fourteenth Amendment requires states to provide "due process of law" before depriving "any person of life, liberty, or property." U.S. Const. amend XIV, § 1.  Due process has two distinct components: one procedural and one substantive. Procedural due process rights protect individuals "from deficient procedures that lead to the deprivation of cognizable liberty interests." *Bartell*, 215 F.3d at 557; *see also Michael H. v. Gerald D.*, 491 U.S. 110, 120–21 (1989) (plurality opinion); *Matthews v. Eldridge*, 424 U.S. 319, 333–34 (1976).  Substantive due process protections ensure that—regardless of the procedural protections available—the government "may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." *Bartell*, 215 F.3d at 557–58; *see also Troxel v. Granville*, 530 U.S. 57, 65–67 (2000) (plurality opinion).

The Fourteenth Amendment's procedural protections extend to the "liberty interest" in the "parent-child relation," an interest a parent may not "be deprived of absent due process of law." *Williams-Ash*, 520 F.3d at 599 (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)). Absent certain exigent circumstances, the state's termination of or interference with parental rights—even temporarily—requires some measure of procedural protection, like proper notice and an opportunity for a hearing.  *See Schulkers*, 955 F.3d at 543; *Williams-Ash*, 520 F.3d at 599; *see also Dupuy v. Samuels*, 465 F.3d 757, 760–61 (7th Cir. 2006).  Another circumstance that removes the state's obligation to provide additional process before removal from custody is a parent's consent or lack of objection to the removal.  *See Williams-Ash*, 520 F.3d at 599–600 ("[H]earings are required for deprivations taken over objection, not for steps authorized by consent." (quoting *Dupuy*, 465 F.3d at 761–62)).  Further, although a parent can withdraw consent to temporary removal, our prior cases have suggested that parents should "explicitly withdraw the consent they explicitly gave."  *Id.* at 601.  We have little caselaw on whether (and in what circumstances) parents may *implicitly* withdraw consent through ambiguous statements or conduct. *Cf. Fisher v. Gordon*, 782 F. App'x 418, 423 (6th Cir. 2019); *see also Andrews*, 700 F.3d at 861 (framing a qualified-immunity dispute by asking whether a reasonable social worker "facing the situation in the instant case" would have known her acts violated clearly established law).

Similarly, the Fourteenth Amendment's substantive protections also extend to the fundamental right that parents have to the "companionship, care, custody and management" of their children. *Schulkers*, 955 F.3d at 539–40 (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)). As our caselaw acknowledges, the "right to family integrity and association without interference from the state" is, in many ways, "the paradigmatic example of a substantive due process guarantee." *Id.* at 540. That right, however, is neither "absolute nor unqualified." *Kottmyer*, 436 F.3d at 690; *see also Reno v. Flores*, 507 U.S. 292, 303 (1993). Indeed, it is "limited by an equaling compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer*, 436 F.3d at 690. As a result, an investigation into allegations of child abuse typically does not implicate the Fourteenth Amendment, *see id.* at 691, although a removal from custody without due process—except in an emergency—is typically impermissible, *id.* at 690. Like for most constitutional rights, valid consent to waive a right to substantive due process typically extinguishes corresponding protections against state action. *See Williams-Ash*, 520 F.3d at 599–600; *Siefert v. Hamilton County*, 951 F.3d 753, 763 (6th Cir. 2020) ("[C]onsent extinguishes constitutional procedural safeguards."); *see also Andrews*, 700 F.3d at 859 (explaining that social workers may obtain consent—waiving Fourth Amendment protections—to enter a property without a warrant).

Our inquiry for the Bambachs' Fourteenth Amendment claims largely starts and ends with *Smith v. Williams-Ash*. The Bambachs argue for an expansive definition of what it means for a right to be clearly established, pointing to *Hope v. Pelzer* for the proposition that broad legal principles can clearly establish law and provide sufficient notice to state officials even under novel factual circumstances. Appellee's Br. 22–23; *see Hope*, 536 U.S. at 741. But the factual circumstances here—especially the facts at the time as known to the state defendants—are *not* novel. And the one case—*Williams-Ash*—with similar factual circumstances cuts in the state defendants' favor. Indeed, this case's general sequence of events nearly perfectly matches that in *Williams-Ash*: first, a parent grants explicit consent to temporary placement; then, days later, asks when he could have his kids back and what would happen next in the investigation. *See Williams-Ash*, 520 F.3d at 598 (describing how "the parties agreed" to the temporary placement plan, the state social worker "launched an investigation," and then over the following two weeks the parents "cleaned their house and repeatedly asked" the social worker "what else they needed to do to allow

the children to return"). In that case, such requests were insufficient to indicate to the social worker that the parents no longer consented to their children's temporary removal from custody. On that ground, we found that the social worker did not violate the parents' right to procedural due process. *See id.* at 599–600. We also found, in an earlier appeal in the same case, that none of the social worker's conduct went so far as to "shock the conscience," indicating a violation of the parents' right to substantive due process. *Smith v. Williams-Ash*, 173 F. App'x 363, 367 (6th Cir. 2005). The same principles govern here.

Although the Bambachs fail to raise any meaningful arguments that *Williams-Ash* should not apply here, we acknowledge that the case does differ in certain aspects from the one before us. For one, the record here, unlike in *Williams-Ash*, does not contain any indication that Moegle drafted a formal, written temporary safety plan for Bambach to review and sign. *See* 520 F.3d at 598. Here, Moegle asked Bambach over the phone whether his daughters could stay with Amy. On that same call, he agreed. For another, the written placement plan in *Williams-Ash* contained an explicit opt-out mechanism, informing the parents that they "must contact [their] caseworker immediately" if they decide they "cannot or will not be able to continue following the plan." *Id.* There is no indication here that Moegle ever informed Bambach he could voluntarily withdraw his consent to the temporary placement with Amy, though the Bambachs do appear to concede that the arrangement was best characterized as a "voluntary safety plan," like in *Williams-Ash*. Appellee's Br. 17; *see also* Pls.' Mot. for Summ. J., R.84 at PageID 2313. We relied on the existence of that opt-out mechanism to explain why it was unreasonable for the social worker in *Williams-Ash* to interpret the parents' conduct as a withdrawal of consent, because they had failed to follow the plain language of the agreement form. *See* 520 F.3d at 600–01.

These distinctions, however, do not change our analysis. While these differences suggest that the question of whether Moegle committed a constitutional violation might be debatable, the case certainly does not *clearly establish* the legal standards that govern when parents may *impliedly* revoke their consent. If anything, *Williams-Ash* arguably implies that parents must *expressly* revoke their consent and that Moegle's actions were fully within the bounds of the law. The similarities between that case and this one underscore why Moegle could not have been on notice that her conduct was unconstitutional. Moegle made sure to receive Bambach's explicit

consent, like in *Williams-Ash*. She completed her investigation and petitioned for a removal order over a roughly two-week span, like the two-week investigation in *Williams-Ash*. *See* 520 F.3d at 598. And Bambach's conduct—asking when he could have his kids back without directly saying that he no longer agreed to have them stay with Amy—almost perfectly tracks the parents' conduct in *Williams-Ash*. *See id.* Like in *Williams-Ash*, Moegle could have reasonably believed that Bambach's nearly identical statements and conduct here did not suffice to withdraw his consent under our existing caselaw. *See Williams-Ash*, 520 F.3d at 601; *Andrews*, 700 F.3d at 856 (asking in the Fourth Amendment context whether it was objectively reasonable for an officer to conclude warrantless entry was "excused by consent"); *see also Fisher*, 782 F. App'x at 423 ("We must determine if the [parents'] statements, behaviors, and lack of objections[] were enough for a reasonable official to conclude that [they] verbally consented to . . . removal."). Further, in the face of Bambach's ambiguous statements and under the apparent—if mistaken—belief that Bambach presented a danger to his daughters, nothing about Moegle's failure to return his children during the short period from December 29, 2015, to January 14, 2016, can be said to "shock the conscience" and violate his right to substantive due process. *See Siefert*, 951 F.3d at 765–67; *Williams-Ash*, 173 F. App'x at 367.

Finally, none of the cases the Bambachs cite convince us that the law clearly established in December 2015 that Moegle's actions were prohibited. As an initial matter, in their Fourteenth Amendment argument, the Bambachs cite only two cases that postdate *Williams-Ash* and predate the events of this case: *Kovacic v. Cuyahoga County Department of Children & Family Services* and an unpublished opinion in *Young v. Vega*. *See Kovacic*, 724 F.3d 687; *Young*, 574 F. App'x 684 (6th Cir. 2014), *overruled on other grounds by Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015); *see also* Appellee's Br. 34–45. Neither case addresses the key question here and in *Williams-Ash*: whether a state officer should have known that a parent could impliedly withdraw prior explicit consent to have his children temporarily removed from his custody pending a protective services investigation. *See Kovacic*, 724 F.3d at 692–93, 695 (indicating only that social workers sought an emergency care order seeking removal of children, not that they ever sought the parents' consent); *Young*, 574 F. App'x at 687 n.2, 690–91, 691 n.6 (holding that no violation of procedural due process occurred during the "initial removal" because it was "voluntary" and assessing whether social workers later fabricated evidence in filing for immediate removal by

court order). In addition, an unpublished case cannot clearly establish the governing law. *See Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).

The two other cases the Bambachs primarily cite similarly fail to assess whether state employees violate parental rights *where the parent gives explicit consent to removal* and then attempts to impliedly withdraw that consent. *See Doe*, 706 F.2d at 987 (no consent to removal); *Vinson*, 820 F.2d at 196 (no initial consent to removal because parent not present during removal). Given the centrality that consent plays in shaping the contours of the constitutional protections available to individuals—in many cases, by removing all protections—neither of those cases defines the Bambachs' Fourteenth Amendment rights at the appropriate level of generality required under a qualified-immunity analysis. Neither does the additional case counsel invoked at argument: *Farley v. Farley*, 225 F.3d 658, 2000 WL 1033045, at *1 (6th Cir. 2000) (unpublished table decision). In *Farley*, the mother—previously subject to a voluntary safety plan—"called" a case worker's supervisor and explicitly "asked that her children be returned to her." *Id.* at *2. Bambach never made such an explicit request. And, lastly, neither do any of the other cases cited in the Bambachs' briefing. *See Quilloin v. Walcott*, 434 U.S. 246, 247 (1978) (explicit objection to adoption); *Lassiter*, 452 U.S. at 20–21 (removal pursuant to court process); *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (no consent); *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (no waiver of rights; not parental-rights case); *Parate v. Isibor*, 868 F.2d 821, 824–25 (6th Cir. 1989) (no waiver of rights; not parental-rights case); *Troxel*, 530 U.S. at 60–61 (plurality opinion) (explicit request to assert parental rights); *Bartell*, 215 F.3d at 554 (explicit request to resume custody); *Williams-Ash*, 173 F. App'x at 366–67 (earlier appeal at motion-to-dismiss stage in later published *Williams-Ash* case; no evidence temporary removal was voluntary); *Kottmyer*, 436 F.3d at 686–87 (no consent).

In sum, the scenario here goes beyond being merely a novel factual circumstance, *see Hope*, 536 U.S. at 741, and ventures into the realm of being entirely factually inapposite. Indeed, the similarity of Bambach's conduct to that of the parents in *Williams-Ash* underscores that it could not have been "apparent" to Moegle that her actions may have violated the law. *Anderson*, 483 U.S. at 640. The closer question is whether *Williams-Ash* clearly establishes that Moegle's actions were *permissible*—and the very fact that we might reasonably debate that question means she

could not have been on notice that her actions were unconstitutional. Here, we're not asking whether a violation occurred—we ask only whether the law clearly established that Moegle should have known her acts were unconstitutional. *Williams-Ash* makes clear that the answer is no. Even assuming a violation existed, then, it's clear that Moegle "reasonably misapprehend[ed] the law governing the circumstances she confronted"—*Williams-Ash*—and is entitled to qualified immunity because the Bambachs' Fourteenth Amendment rights were not clearly established under the circumstances here. *Taylor*, 592 U.S. at 8.

### 2. No Existing Law Clearly Established that Moegle Violated the Bambachs' Fourth Amendment Rights Against Warrantless Seizures.

Much like it did for the Bambachs' Fourteenth Amendment claims, Bambach's explicit consent to an initial removal makes all the difference in their Fourth Amendment claims. Both *Williams-Ash* opinions, as indicated above, formally apply only to Fourteenth Amendment substantive- and procedural-due-process claims. *See Williams-Ash*, 520 F.3d at 599; *Williams-Ash*, 173 F. App'x at 367. But because consent is a widely recognized and accepted exception to Fourth Amendment requirements, *see Andrews*, 700 F.3d at 854, 859, our analysis of the Bambachs' Fourteenth Amendment claims similarly illuminates why the Bambachs cannot show that their alleged Fourth Amendment rights were clearly established in December 2015.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend IV. Searches and seizures "without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). So, warrantless searches and seizures by a state officer violate the Fourth Amendment unless a recognized exception to the warrant requirement applies. *Andrews*, 700 F.3d at 854. Certain exigent circumstances can constitute a valid exception to the warrant requirement. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (describing emergencies like fighting fires, preventing imminent destruction of evidence, engaging in immediate pursuit of a fleeing suspect, and rendering aid to people who are seriously injured or threatened by injury). Valid consent to a search or seizure is also an exception to the warrant requirement. *Andrews*, 700 F.3d at 854. In this circuit, the Fourth Amendment clearly prohibits a child-services case worker's search of a parent's home without a valid court order. *Id.* at 859–60. Logically, it also prohibits *removal* of a child without a court order or the existence of a valid exception to the warrant

requirement. *See Kovacic*, 724 F.3d at 699. Applying typical Fourth Amendment principles, then, it follows that consent to a removal or search excuses the state employee's failure to obtain a warrant or other court order. *See Andrews*, 700 F.3d at 859; *Kovacic*, 724 F.3d at 695 (affirming that social workers are governed by the Fourth Amendment's strictures with respect to removals from parental custody).

We determined above that, under the existing legal landscape, Moegle would not have reasonably understood that Bambach withdrew his consent to have his children stay with Amy temporarily while the investigation was completed. The same determination makes clear why the Bambachs' Fourth Amendment rights were not clearly established: valid consent excuses state actors from compliance with Fourth Amendment restrictions. And, per *Williams-Ash*, not every reasonable officer would have understood that Bambach's conduct legally sufficed to withdraw his consent to the continued removal of his daughters from his custody. Because it was not "apparent" that Bambach could impliedly revoke his consent, especially considering that *Williams-Ash* indicates similar conduct did not constitute a revocation, the Bambachs' Fourth Amendment rights against Moegle's failure to return the children were not clearly established in December 2015. *See Anderson*, 483 U.S. at 640.

None of the Fourth Amendment cases the Bambachs cite grapple with this case's defining characteristic: granting explicit consent to a temporary removal—which constitutes a reasonable seizure under the Fourth Amendment—and then attempting to impliedly withdraw that consent by inquiring about the status of the investigation and what Bambach needed to do to get his children back. *See Payton v. New York*, 445 U.S. 573, 577–78 (1980) (establishing only general right against warrantless searches; no consent existed for the search); *Farley*, 225 F.3d 658 (unpublished table decision) (explicit request to resume custody); *Williams-Ash*, 520 F.3d at 598;[3] *Andrews*, 700 F.3d at 860 (state did not argue plaintiff consented to search); *Kovacic*, 724 F.3d at 695–96

---

[3]We note that the Bambachs rely on *Williams-Ash* for the proposition that consent under the Fourth Amendment can be "revoked by a parent's conduct," including failure to cooperate with protective services, asking protective services what could be done to get the children back, and hiring an attorney. Appellee's Br. 31–32. This reliance is misplaced. As explained elsewhere, *Williams-Ash* held that such conduct was *insufficient* (for a claim under the Fourteenth Amendment) to indicate to a case worker that the parents had revoked their consent. 520 F.3d at 600–01.

(exclusive focus on exigent circumstances); *Barber*, 809 F.3d at 842 (in-school interview of children without consent).

Consent is a key exception to the Fourth Amendment warrant requirement. We need not even articulate the alleged right here overly specifically in order to find for the state defendants: through the entire time period at issue here, governing law tended to support that Bambach's conduct did not suffice to revoke his explicitly given consent. *See Williams-Ash*, 520 F.3d at 601. In essence, the law indicated it was reasonable for Moegle to believe she never lost Bambach's explicit consent to his daughters' temporary placement with Amy. Under that framing, the Fourth Amendment right here is familiar to us, and it may be answered in a familiar manner: valid consent excuses the need for a state official to seek and obtain a warrant for a search or seizure pursuant to the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).[4]

**C.      Shaw Is Entitled to Qualified Immunity on the Bambachs' Fourth and Fourteenth Amendment Claims.**

Much as the Bambachs' claims against Moegle must fall, so too do their claims against Shaw. The Bambachs argue only that Shaw is liable under § 1983 because she has implicitly authorized, approved, or acquiesced to Moegle's unconstitutional conduct. Appellee's Br. 45. The Bambachs further concede that Shaw's supervisory liability depends on the law clearly establishing that Moegle's actions were unconstitutional. *Id.* at 48. The Bambachs are correct that our law clearly establishes liability where a subordinate has violated the law and the supervisor has implicitly authorized, approved, or acquiesced to that conduct. *See, e.g.*, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Coley v. Lucas County*, 799 F.3d 530, 542 (6th Cir. 2015). As the state defendants point out, though, a necessary predicate to that liability is the existence of clearly established law indicating the *subordinate's* actions were unconstitutional. Appellant's Br.

---

[4]It's unclear whether a Fourth Amendment claim alleging execution of a false or misleading removal order remains before the district court. *See* Partial Grant of Defs.' Mot. for Summ. J., R.98 at PageID 3253; Partial Grant of Defs.' Mot. to Dismiss, R.50 at PageID 1068. Neither party addresses this issue in their appellate brief, and the Bambachs focused solely on the consent-to-seizure issue in their response to the state defendants' motion for summary judgment. For the sake of completeness, we reaffirm the district court's holding at the motion-to-dismiss stage that Moegle and Shaw possess absolute immunity for initiating the removal petition, meaning that claim must also be dismissed. *See* Partial Grant of Defs.' Mot. to Dismiss, R.50 at PageID 1045–46; *see also Barber*, 809 F.3d at 843–44.

31; *see Taylor v. Barkes*, 575 U.S. 822, 825–27 (2015) (per curiam) (assessing whether the law was clearly established for a prison warden and commissioner by assessing whether the law clearly prohibited a subordinate contractor's conduct); *cf. McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."). The Bambachs have identified no case in which we have held that the law clearly established a supervisor—but *not* a subordinate—could be liable for the subordinate's constitutional violations. *See* Appellee's Br. 48–49. Of course, logically, a supervisor might be directly liable for any constitutional violations they commit. But the Bambachs do not argue Shaw is directly liable outside her supervisory capacity. *See* Appellee's Br. 45–51.

We have determined the law did not clearly establish that Moegle's conduct violated the Constitution. Because not every reasonable officer would have understood at the time that Moegle's conduct violated the Fourth and Fourteenth Amendments, we extend that holding to Shaw. Accordingly, Shaw, like Moegle, is also entitled to qualified immunity.

## IV.   CONCLUSION

We **REVERSE** the district court's denial of the defendants' motion for summary judgment on the plaintiff's Fourth and Fourteenth Amendment claims and **REMAND** for entry of an order dismissing the claims against all defendants.